619 F.2d 784
 N-REN CORPORATION, as Successor to St. Paul Ammonia
Products, Inc., Appellant,
v.
AMERICAN HOME ASSURANCE COMPANY, Appellee.
N-REN CORPORATION, as Successor to St. Paul Ammonia
Products, Inc., Appellee,
v.
AMERICAN HOME ASSURANCE COMPANY, Appellant.
 Nos. 79-1287, 79-1312.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 5, 1979.
Decided May 1, 1980.
Rehearing and Rehearing En Banc Denied May 20, 1980.
 
 Harding A. Orren (on brief), Robins, Davis & Lyons, Minneapolis, Minn., for appellant; John N. Love, Minneapolis, Minn., on brief.
 David C. Forsberg (on brief), Briggs & Morgan, St. Paul, Minn., for appellee; John L. Devney, St. Paul, Minn., on brief.
 Before GIBSON, Chief Judge,* and STEPHENSON and HENLEY, Circuit Judges.
 HENLEY, Circuit Judge.
 
 
 1
 In this diversity action originating in the United States District Court for the District of Minnesota plaintiff, N-Ren Corporation as Successor to St. Paul Ammonia Products, Inc. (SPAP), sought to recover for business interruption and property damages under an insurance policy issued by American Home Assurance Company (American Home). The district court[1] following a trial without jury ultimately entered judgment in the amount of $501,721.56 for plaintiff insured, but denied plaintiff's claim for prejudgment interest in the amount of $68,421.73.[2]
 
 
 2
 On appeal American Home contends that the loss was not covered by the insurance policy. Plaintiff insured cross-appealing contends the district court erred in not awarding prejudgment interest. Finding no error, we affirm.
 
 
 3
 * SPAP is a former Minnesota corporation engaged in the production of anhydrous ammonia.[3] In December, 1971 SPAP was issued an insurance policy by American Home. The policy was an all-risks Difference In Conditions policy which insured SPAP and its successors "against all risks of direct physical loss or damage occurring during the period of this policy to the insured from any external cause." The policy, however, excluded loss or damage "caused by or resulting from . . . (c) errors in design, . . . unless the collapse of the property or a part thereof ensues and then only for the ensuing loss." The policy also excluded in certain circumstances loss or damage caused by gradual deterioration and ordinary wear and tear.[4]
 
 
 4
 The present controversy stems from an accident at SPAP's Apple River Plant in East Dubuque, Illinois where the company produced anhydrous ammonia for use principally as a nitrogenous fertilizer. At this plant the company used a chemical reactive process, which occurred in a series of rather large interrelated structures.
 
 
 5
 One of the component units was known as an R-3. This unit was designed to convert carbon monoxide and water into hydrogen and carbon dioxide. The R-3 had a height of twenty-eight feet and a diameter of twelve and a half feet. The carbon monoxide and water entered the R-3 in the form of gas and steam, and descended through sixteen feet of catalyst pellets, finally exiting at the bottom to go to other parts of the system for additional processing.
 
 
 6
 The R-3 was designed to withstand tremendous pressure and heat. It had a steel outer casing as well as a three inch refractory lining. The lining was a cement-like insulation which was sprayed onto the inner wall of the vessel and protected the steel from intense heat within the vessel.
 
 
 7
 The inner structure of the R-3 included three stainless steel I-beams which spanned the interior of the R-3, a catalyst support grate which rested on the lower flange of the I-beams, and a steel screen which covered the top of the support grate. Directly above the steel screen was a four inch layer of ceramic pellets (about one-half inch in diameter) and, above that, sixteen feet of catalyst pellets (about one-quarter inch in diameter), with a layer of alumina balls on the uppermost level.
 
 
 8
 The I-beams were surrounded by catalyst and ceramic pellets and designed so that when the system was not in operation there was a one inch gap between each end of the I-beam and the interior surface of the refractory to allow for expansion when the I-beams were heated to operating temperature. When the system was not in operation, pellets could enter this gap. Furthermore, if there was a failure of the refractory lining at the level of the catalyst support grate, there was nothing to prevent the pellet and alumina balls from escaping into the downstream parts of the system.
 
 
 9
 On December 7, 1972 precisely this occurred: the refractory lining collapsed at the level of the catalyst support grate and the catalyst and ceramic pellets together with the alumina balls were forced at high pressure past the support grate and into adjoining vessels and appurtenant pieces of machinery. The breakdown destroyed the catalyst in the R-3 and another vessel, ruptured some steel piping and damaged exchanges, boilers and other downstream equipment. Process solutions were rendered useless. The plant had to close for repairs from December 7, 1972 through December 21, 1972 and the plant apparently operated at a reduced production rate from December 21, 1972 through March 14, 1973.
 
 
 10
 SPAP submitted claims under various insurance policies including its policy with American Home. American Home, however, denied coverage and this lawsuit followed.
 
 
 11
 At trial SPAP argued that American Home was liable because the loss was caused by errors in design of the catalyst support structure and that the design errors were "external causes" leading to the collapse of part of the refractory within the meaning of the policy. SPAP found two basic design errors. First, SPAP contended that the R-3 was erroneously designed because it contained nothing to prevent the pellets and balls from escaping at high velocity into the downstream part of the system in the event of a failure of the refractory at the catalyst level of the support structure. Second, SPAP contended that the R-3 was erroneously designed because the I-beams were above the support grate with pellets packed around them. As stated, when the system was cooled, there was a one inch gap between the end of the I-beam and the surface of the refractory. When the system was operating, however, the I-beams expanded about a half inch on each end and thus pushed the catalyst pellets into the refractory eventually destroying the integrity of the refractory surface.
 
 
 12
 In defense American Home contended that the loss was caused solely by the gradual deterioration and wear and tear of the refractory lining of the seven year old vessel and was an excluded peril under 8(g) of the policy.[5] It also contended that the design error was not an external cause and that the I-beams location on top of the catalyst support system did not cause the loss. Finally American Home argued that the plaintiff was precluded from asserting that the failure of the catalyst support structure to prevent the bypass of the pellets and balls was a design error because such claim was not timely asserted.
 
 
 13
 The trial court, however, found in favor of plaintiff and awarded damages. The court found both design errors to be a contributing cause of the loss, and that the errors in design were "external causes" within the meaning of the policy. Further, the court found that the refractory gave way suddenly and became useless constituting a "collapse" within the meaning of the policy.[6]
 
 
 14
 In its judgment the trial court did not award prejudgment interest. The district court held that such amounts could not be determined by mere computation or from generally recognized objective standards. Noting that SPAP had filed several claims of loss in varying amounts,[7] the district court had little difficulty deciding that SPAP's claim was unliquidated and thus SPAP was not entitled to prejudgment interest under Minnesota prejudgment interest rules.
 
 II
 
 15
 On appeal American Home first argues that SPAP's loss does not fall within the coverage of the insurance policy. Dividing the policy language into various parts, American Home contends that (1) the design errors were not "external causes, (2) the refractory did not "collapse," and (3) the refractory failure did not "ensue" from the two alleged design errors.
 
 
 16
 * Turning first to American Home's argument that the design errors were not "external causes" but rather "internal causes" or inherent defects in the subject matter, we note at the outset that few cases have focused on the meaning of the phrase "external cause" and no case cited to us has directly faced the difficult question of whether a design error is an "external cause." A most illuminating discussion of the term is provided in Contractors Realty Co. v. Insurance Co. of North America, 469 F.Supp. 1287 (S.D.N.Y.1979). There, Judge Pollack[8] noted that the requirement of an "external cause" is intended to exclude from coverage three types of losses: (1) losses resulting from negligent acts of the owner or master, (2) losses resulting from normal wear and tear, and (3) losses resulting from internal decomposition or deterioration of the insured property. Although the term "external cause" may not be susceptible to such precise classification, we believe that that for purposes of this case this list provides an accurate synthesis of the basic areas of loss an insurer may intend to exclude from coverage through an "external cause" requirement.
 
 
 17
 Applying the Pollack test to the present case, we are persuaded that the design errors must be considered external causes of the loss to the insured. First, the loss resulted neither from the negligence of the owner nor wholly as a result of normal wear and tear. And this is clearly not a case where the insured property internally deteriorated and decomposed. Rather, the loss resulted from a design error, a cause which clearly does not fit within any of the areas generally intended to be excluded from coverage under the "external cause" requirement.
 
 B
 
 18
 But assuming the design errors are "external causes," American Home next argues that SPAP's losses are still not covered under the policy. Paragraph 8(c) of the policy excludes from coverage "errors in design . . . unless the collapse of the property or a part thereof ensues and then only for the ensuing loss." Because the refractory did not completely collapse but was left intact except for two comparatively small areas, American Home claims the incident did not constitute a collapse within the meaning of paragraph 8(c).
 
 
 19
 American Home's argument has no merit. If it be conceded arguendo that destruction of two small areas in the refractory surface may not constitute a collapse, the changes in the refractory surface were not the only changes in the R-3 that ensued as a result of the design errors. At the point where the refractory gave way, eight feet of catalyst pellets at high velocity were thrust past the support grate and into other vessels and appurtenant pieces of machinery rupturing steel piping and damaging other equipment. In these circumstances, we have no difficulty in holding that within the meaning of the policy a collapse of the property ensued as a result of the design errors.
 
 
 20
 The policy provided coverage for a "collapse of the property or a part thereof " (emphasis added). Insurance policies providing coverage for "partial collapse" may, of course, be interpreted as requiring a lesser degree of breakdown than those providing coverage only for a complete collapse of the property. Rogers v. Maryland Cas. Co., 252 Iowa 1096, 109 N.W.2d 435 (Iowa 1961); Employers Mut. Cas. Co. v. Nelson, 351 S.W.2d 278 (Tex.Civ.App.1961). We need not address the question whether the present incident would constitute a "collapse" under a policy providing coverage only in the event of a complete collapse.
 
 C
 
 21
 American Home next argues that the refractory failure, if there was one, did not "ensue" from the alleged design errors. Discussing first the error of failing to provide a catalyst support system which in the event of a failure of the refractory would prevent catalyst pellets from escaping, American Home contends that the refractory failure did not "ensue" from this design error because a more elaborate support system would only have prevented the escape of pellets and not the failure of the refractory.
 
 
 22
 American Home additionally contends that the collapse could not have ensued from the design error relating to the expansion of the I-beams. Alleging that the failure of the refractory occurred some sixty degrees east of the north end of the I-beam, American Home asserts the gap in the refractory was not located in a position which would allow pellets to be thrust to the bottom of the vessel.
 
 
 23
 These arguments largely raise questions of fact and the inferences to be drawn therefrom. We have fully considered them in light of the record evidence and are unable to find clear error on the part of the district court.
 
 III
 
 24
 American Home argues finally that the trial court erred in basing its judgment, at least in part, on a theory which allegedly was raised by the insured for the first time after trial. American Home claims that SPAP's theory that the design error concerning the failure to prevent the escape of catalyst pellets in the event of a refractory failure was a cause of the collapse of the R-3 was not mentioned until closing arguments and was not formally submitted to the trial court until some five months after the trial. Appellant asserts that any previous reference to this design error was made only in the context of explaining why the pellets escaped rather than as a theory explaining the cause of the refractory failure.
 
 
 25
 The district court, however, rejected this argument noting that SPAP's opening statement referred to the design error concerning the failure to prevent the escape of pellets in the event of a refractory failure. After carefully reviewing the record, we are persuaded that American Home was sufficiently alerted to SPAP's theory as to the catalyst support system design error and the district court's reliance on this theory did not constitute reversible error.[9]
 
 IV
 
 26
 Concluding, we address the argument of the cross-appellant that the trial court should have awarded interest from thirty days after the submission of the notice of claim on the physical damage portion of the loss. Contending that the record discloses no significant controversy as to the amount of the physical loss, SPAP claims that under Minnesota law they are entitled to an award of interest of six per cent simple interest on the stipulated damage figure of $233,314.00 from August 27, 1973 to July 17, 1978, or $68,421.73, and a total award of damages of $570,143.29 ($501,721.56 plus $68,421.73 interest).
 
 
 27
 Cross-appellant SPAP's claim is without merit. Minnesota law provides prejudgment interest only on liquidated claims, Bellanca Aircraft Corp. v. Fireman's Fund Ins. Co., 353 F.Supp. 929 (D.Minn.1973), and unliquidated claims ascertainable by computation or reference to recognized standards such as market value and not dependent on contingency. Lacey v. Duluth & Iron Range Ry., 236 Minn. 104, 51 N.W.2d 831 (1952). Based on the fact that SPAP submitted four different damage figures estimating its loss and never furnished American Home with a formal proof of loss, we are convinced that SPAP's damage claim was neither liquidated nor ascertainable and that the trial court was correct in denying prejudgment interest.
 
 
 28
 Affirmed.
 
 
 
 *
 The Honorable Floyd R. Gibson was Chief Judge of the Eighth Circuit at the time this case was submitted and took senior status on December 31, 1979, before the opinion was filed
 
 
 [1]
 The Honorable Donald D. Alsop, United States District Judge for the District of Minnesota
 
 
 [2]
 Following the judgment, the parties made various motions. American Home, the insurer, moved for amended findings of fact, conclusions of law and judgment, or, in the alternative, a new trial. American Home also moved that the judgment be opened and additional testimony be taken under Fed.R.Civ.P. 59. Furthermore, SPAP moved for amended findings under Fed.R.Civ.P. 60(a) and (b)(1), (6) and for leave to take additional depositions. The trial court, however, denied all of these motions except to correct two minor errors in the amount of the judgment
 
 
 [3]
 After the commencement of this action, SPAP became a division of N-Ren Corporation by virtue of a merger. SPAP, however, has continued in the same business
 
 
 [4]
 These two exclusions specifically provided as follows:
 
 
 [8]
 PERILS EXCLUDED: This policy does not insure against loss or damage caused by or resulting from:
 (c) errors in design, errors in processing, faulty workmanship or faulty materials, unless the collapse of the property or a part thereof ensues and then only for the ensuing loss;
 (g) . . . gradual deterioration, . . . ordinary wear and tear, . . . unless such loss or damage is caused directly by perils not otherwise excluded.
 
 
 [5]
 See n.4, supra
 
 
 [6]
 The trial court found that gradual deterioration and ordinary wear and tear were also contributing causes to the loss but determined that because the losses and damages suffered by SPAP were caused both by the excluded cause (gradual deterioration and ordinary wear and tear) and an included cause (design errors), the loss was covered by the policy. The court reasoned that "If it were not intended that . . . included and non-included causes were covered, there would be no reason for the phrase 'unless such loss or damage is caused directly by perils not otherwise excluded.' "
 
 
 [7]
 SPAP filed various notices of loss including one dated July 19, 1973 in the amount of $576,400.56 and another dated October 26, 1973 in the amount of $716,901.88. SPAP also filed an undated claim in the amount of $691,661.26 and after trial submitted a conclusion of law stating that it was entitled to judgment against the defendant in the amount of $614,966.91 together with interest thereon at six per cent per annum from August 27, 1973
 
 
 [8]
 The Honorable Milton Pollack, United States District Judge for the Southern District of New York
 
 
 [9]
 We note, however, that even if the trial court did wrongfully rely on this theory, the error would not constitute grounds for reversal. For under the theory of the I-beam design error alone, the insurance policy still must be read to provide coverage. Thus, any error that inhered in the district court's reliance on the catalyst support system theory would be harmless error, Fed.R.Civ.P. 61