[No. A044286. First Dist., Div. Three. June 13, 1990.]

ACME GALVANIZING CO., INC., et al., Plaintiffs and Appellants,
v.
FIREMAN'S FUND INSURANCE COMPANY et al., Defendants
and Respondents.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts IV-B and IV-C.

**COUNSEL**

Gerald R. Welch for Plaintiffs and Appellants.

Hardin, Cook, Loper, Engel & Bergez, Ralph A. Lombardi, Thomas E. Mulvihill, Gordon & Rees, Jack B. McCowan, Jr., and Diane R. Crowley for Defendants and Respondents.

**OPINION**

**STRANKMAN, J.—**

## I. *Synopsis of Case*

Plaintiff and appellant Acme Galvanizing Co., Inc. (Acme), was the insured under an "all risk" commercial insurance policy issued by defendant and respondent Fireman's Fund Insurance Company (Fireman's). In February 1982, a steel kettle at Acme's Stockton plant ruptured, allowing several tons of molten zinc in the galvanizing process to spill onto the surrounding equipment. Acme ultimately submitted a loss claim under the policy to Fireman's. Following an investigation, Fireman's denied coverage on the ground the loss was not caused by an external cause, but rather a latent defect or inherent vice and therefore was excluded from coverage under the policy.

Acme, plaintiff and appellant Sheridan C. Randolph (Acme's president), and plaintiff and appellant Harry L. Randolph filed a complaint against Fireman's and its insurance agent Joseph L. Taranto and Taranto & Company Insurance Services (collectively Taranto). The complaint stated several tortious causes of action, including "tortious breach of insurance contract" and intentional infliction of emotional distress. Fireman's filed a cross-complaint for declaratory relief, seeking an adjudication of noncoverage under the policy.

The case proceeded to jury trial. Following the presentation of plaintiffs' case, Fireman's and Taranto moved for nonsuit. (Code Civ. Proc., § 581c.) The trial court granted nonsuit as to all of plaintiffs' claims, finding, among other things, that, as a matter of law, the loss was not covered by the policy because it was not caused by an external cause but rather a latent defect or inherent vice. The trial court concurrently entered judgment in favor of Fireman's on the cross-complaint.

Acme and the Randolphs appeal. We affirm.

## II. *Standard of Review*

■ A trial court may not grant a motion for nonsuit if the evidence presented by the plaintiff would support a jury verdict. In reviewing the plaintiff's evidence, the trial court may not weigh the evidence or consider the credibility of witnesses. Instead, the trial court must accept the evidence most favorable to plaintiff as true, disregard conflicting evidence, and indulge every legitimate inference which may be drawn therefrom in plain-

tiff's favor. (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 838-839 [206 Cal.Rptr. 136, 686 P.2d 656]; *Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 117-118 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036].) In an appeal from a judgment of nonsuit, the reviewing court is bound by the same rules governing the trial court in ruling on a motion for nonsuit. (*Carson, supra*, at p. 839.)

■ We recognize that courts grant motions for nonsuit only under very limited circumstances. (*Carson* v. *Facilities Development Co., supra*, 36 Cal.3d at p. 838.) We also recognize, however, that in cases such as the instant one where the evidence as to the plaintiff insured's loss and the cause of such loss is essentially undisputed, but the plaintiff and defendant insurer dispute whether such loss falls within the exclusionary provisions of the policy, courts have not been reluctant to dispose of the plaintiff's case prior to submission to the trier of fact. (See *Murray* v. *State Farm Fire & Casualty Co.* (1990) 219 Cal.App.3d 58 [268 Cal.Rptr. 33]; *Brodkin* v. *State Farm Fire & Casualty Co.* (1989) 217 Cal.App.3d 210 [265 Cal.Rptr. 710]; *Tzung* v. *State Farm Fire and Cas. Co.* (9th Cir. 1989) 873 F.2d 1338.) In these cases, summary judgment in favor of the insurer was upheld on the ground the uncontroverted evidence as to the cause of a loss established the loss fell within the exclusionary provisions as a matter of law.

## III. *Facts and Order of Nonsuit*

The following facts were established at trial during the presentation of plaintiffs' case.

### A. *"All Risk" Policy Provisions*

The policy issued to Acme covering Acme's business personal and real property insured "against all risks of direct physical loss or damage from any external cause to such property . . . , subject otherwise to all of the provisions and stipulations of the policy . . . ." The "Perils Excluded" section of the policy provided in pertinent part: "The Property Coverage does not insure against loss caused by, resulting from, contributed to or aggravated by: [¶] 13. Inherent vice, latent defect, wear and tear, marring and scratching, gradual deterioration, moths, termites or other insects or vermin, unless loss by a peril not otherwise excluded ensues and then the Company shall be liable only for such ensuing loss . . . ."

### B. *Rupture of Kettle at Acme's Plant*

On February 26, 1982, at Acme's Stockton plant, a welded seam in an 84-ton capacity galvanizing kettle failed, the kettle ruptured, and several tons

of molten zinc escaped. The molten zinc damaged or destroyed the surrounding equipment, including the galvanizing furnace burners and floor boards, and refractory system consisting of firebrick that enclosed the kettle. The kettle failure and leakage resulted in the immediate shutdown of operations at the Stockton plant.

## C. *Investigation of Acme's Claim of Loss*

Sheridan Randolph testified that she immediately notified her insurance agent, Taranto, of the loss and that, during the next 18 months, Taranto advised her that her claim was being investigated although no one contacted her to examine the kettle or investigate the loss. In September 1983, Taranto informed Mrs. Randolph that her claim had been denied because the loss was caused by faulty workmanship and therefore not covered under the policy.

In January 1985, Mrs. Randolph learned that Taranto had never notified Fireman's of her claim. She then contacted Fireman's directly in February 1985 and submitted her claim of loss. She also retained counsel who initiated this action against Taranto and Fireman's. On March 4, 1985, Acme's claim was assigned to Edgar McPherson Howell, Jr., a field claims representative. Howell immediately attempted to contact Mrs. Randolph to schedule an inspection of the Stockton plant, and an inspection was scheduled for March 15, 1985. On that date, Howell met with the Randolphs at Acme's plant to examine the kettle and failed welding, and questioned Mrs. Randolph about the plant closure and loss of income. His notes reflected that most of Acme's Stockton customers went to Acme's Oakland plant.

Following Howell's initial field investigation, Acme's claim was assigned to Ms. Schmoeckel, a senior claims supervisor. Ms. Schmoeckel assigned another field claims representative to Acme's claim for additional investigation and retained Robert Anderson, a metallurgist, to examine the failed welded seam and determine the cause of the failure. Anderson inspected the seam on two occasions and provided written reports to Fireman's, dated May 13 and June 22, 1985. Anderson opined: "I believe that the kettle failure was principally due to poor welding techniques. The weld is just not adequate for the service intended."

After receiving Anderson's reports and Acme's formal proof of loss claim in the amount of $2 million, Ms. Schmoeckel determined additional information was needed from Acme. She then referred the file to Attorney Stuart Kinder to conduct an examination under oath of the insured and to provide an opinion regarding coverage.

Kinder specializes in advising insurers regarding property insurance claims. After conducting an examination under oath of Mrs. Randolph and reviewing Fireman's files and Acme financial data, Kinder forwarded a written opinion to Fireman's on March 6, 1986. The report concluded that the policy exclusion for "inherent vice and latent defect" applied to the loss. Kinder explained that Anderson had determined the rupture was due principally to poor welding techniques, indicating that the failure resulted from a condition inherent in the manufacturing process. He further explained: "In conclusion, the inadequate weld seam was an internal characteristic of the kettle which was not readily detectable upon reasonable inspection. In support of this conclusion, we observe that the defect could only be found by Dr. Anderson after destructive testing was performed." Kinder further concluded Acme's financial records showed it did not suffer a business interruption loss, but rather saved money because the business transacted in Stockton was transferred to Oakland, and the consolidation of operations was cost effective. Kinder recommended that Fireman's initiate an action for declaratory relief regarding coverage.

On March 28, 1986, Fireman's offered to advance funds to Acme to make necessary repairs and to compensate for any business interruption loss, on condition that, if Fireman's prevailed in a declaratory relief action, Acme would reimburse Fireman's for all funds advanced. Acme rejected the offer.

### D.   *Plaintiffs' Evidence Adduced at Trial of Loss*

Plaintiffs' expert at trial was Robert Olsen, a metallurgical engineer with expertise in welding failure analysis and nondestructive testing methods for such analysis. He testified that the quality of the kettle's welding was inadequate and defective in that its design left a lack of penetration at the weld joint such that it would come apart when subjected to stress. In his opinion, the kettle could have had a normal life of 15 to 20 years if the welding had been adequate, and that it failed before its normal life. He also testified that radiographic and ultrasonic testing were among nondestructive methods for failure testing of welds.

### E.   *Order of Nonsuit*

In granting the motion for nonsuit, the trial court stated the loss was caused by an inherent vice and latent defect and therefore was not a covered loss, and further stated there was no ensuing loss caused by a nonexcluded peril. The trial court further ruled that the absence of coverage

precluded plaintiffs' bad faith and other tort claims relating to Fireman's and Taranto's handling of Acme's claim.

## IV.  *Discussion*

### A.  *Coverage*

There is a paucity of California case law interpreting the "inherent vice/latent defect" exclusionary provision in Fireman's policy. A federal Ninth Circuit decision, however—*Tzung* v. *State Farm Fire and Cas. Co., supra,* 873 F.2d 1338—provides some guidance. There the plaintiff insureds noticed cracks in the driveway and slabs of their apartment building and made a claim for coverage under their " 'all risk' " policy with State Farm. State Farm denied coverage, citing exclusionary provisions in the policy for losses caused by, inter alia, earth movement, subsurface water, faulty workmanship, and inherent defect. The insureds initiated a lawsuit against State Farm. State Farm moved for summary judgment. In opposition, the insureds filed declarations of experts stating that the damage was caused by improper testing of the soil and the contractor's failure to properly construct the building to withstand soil expansion, and that the triggering cause of the damage was the expansion of the soil beneath the building due to subsurface water. (*Id.,* at p. 1339.)

The trial court granted summary judgment in favor of State Farm. On appeal, the court affirmed. The court found, inter alia, that the policy's exclusion for losses caused by latent or inherent defect was applicable to the insureds' loss if the design and construction defects which caused the loss were not "readily discoverable." The court concluded they were not: "[The insureds'] entire theory of liability is premised on the opinions of two experts who conducted a thorough examination of the apartment building and the soils beneath it. These defects, then, cannot be said to have been 'readily discoverable.' " (*Tzung* v. *State Farm Fire and Cas. Co., supra,* 873 F.2d at p. 1342.)

Another federal decision—*Aetna Casualty & Surety Co.* v. *Yates* (5th Cir. 1965) 344 F.2d 939—is instructive as to the application of the "inherent vice" exclusion. There, the insureds discovered the subflooring of their home was severely rotted away. The crawl space underneath the home was inadequately supplied with vents which produced condensation of moisture and consequent rotting. The insureds made a claim for coverage under their "All Risk" policy with Aetna, which was denied. In the ensuing lawsuit, the court found the loss was excluded from coverage as a matter of law because the cause of the loss—defective construction—was an "inherent vice" within the exclusionary provisions of the policy. (*Id.,* at pp. 940-941.)

In a California decision, *Brodkin* v. *State Farm Fire & Casualty Co.*, *supra*, 217 Cal.App.3d 210, the insurer relied upon an exclusionary clause similar to the one under review here, though not specifically or exclusively the latent defect/inherent vice exclusion, to deny coverage. There, the plaintiff insureds made a claim for coverage under their homeowners policy with State Farm after discovering numerous cracks in the floor and foundation of their house resulting from corrosion of the foundation. State Farm denied coverage under numerous exclusionary provisions in the policy. In the ensuing lawsuit, State Farm moved for summary judgment. In opposition, the insureds filed declarations of their experts stating that the damage to the concrete foundations was caused by corrosives in the soil, possibly cow urine. The court granted summary judgment, finding that if the presence of cow urine or other corrosives in the soil was the proximate cause of the damage, then the policy's exclusions for " 'deterioration,' " " 'inherent vice,' " and " 'contamination' " precluded coverage as a matter of law. (*Id.*, at p. 217.)

Despite the paucity of California authority clarifying the "latent defect/inherent vice" exclusionary provision, Code of Civil Procedure section 337.15, which establishes the limitations period for actions arising from latent construction defects, provides a useful standard. That section prescribing a 10-year limitations period for actions for damages for "latent deficiencies" in improvements to real property, defines latent deficiency as one "which is not apparent by reasonable inspection." (Code Civ. Proc., § 337.15, subd. (b); see *Preston* v. *Goldman* (1986) 42 Cal.3d 108, 123 [227 Cal.Rptr. 817, 720 P.2d 476].) In *Winston Square Homeowner's Assn.* v. *Centex West, Inc.* (1989) 213 Cal.App.3d 282, 291 [261 Cal.Rptr. 605], the court found that drainage problems in a townhouse development were patent, not latent, as defined in section 337.15, where the cause of the problem—the contours of the land and the slant of the pavement which did not allow for proper drainage—and the manifestations of the problem—ponding of water at various places throughout the development—were obvious. (*Id.*, at pp. 290-291.)

■ We find the "not apparent by reasonable inspection" standard under Code of Civil Procedure section 337.15 constitutes an appropriate standard for determining whether a defect is latent in the context of the exclusionary provisions of an all-risk insurance policy.

Thus, where defective construction, design, or fabrication of property results in the property's failure or deterioration before its normal life, and the defect is not apparent upon reasonable inspection but only after a post-failure examination by an expert, then the resulting loss is caused by a "latent defect."

■ Here, Acme's expert established in the presentation of its case that the kettle rupture was caused by inadequate welding due to a defective design of the welding. The expert was able to reach this conclusion only after examining an assembly drawing of the kettle, and stated that further analysis could be made by radiographic and ultrasonic testing. We conclude such evidence establishes the welding defect was not apparent upon reasonable inspection, but was a latent defect, as a matter of law. As such, the resulting damage was excluded from coverage under the policy as a matter of law. To hold the reverse would be to render the phrase "latent defect" meaningless and to transmute the insurance policy into a type of warranty.

■ Acme argues that even if the kettle rupture was caused by a latent defect, the discharge of molten zinc which damaged or destroyed the surrounding equipment was an "ensuing loss" not excluded from coverage. Acme refers to the exception to the exclusionary clause which provides coverage for a loss precipitated by an excluded peril where a "loss by a peril not otherwise excluded ensues and then the Company shall be liable for only such ensuing loss."

In *Murray,* a copper pipe beneath a concrete slab floor in the insureds' home ruptured. Experts agreed the rupture was caused by corrosion precipitated when the pipe was exposed to moisture and acidic soil. As a result of the leak, the ground underneath the pipe settled, causing a crack in the concrete slab. The insureds made a claim for coverage under their insurance policy with State Farm. State Farm denied coverage under a provision excluding coverage for losses caused by " '. . . wear, tear, marring, deterioration, inherent vice, latent defect and mechanical breakdown . . . .' " (*Murray* v. *State Farm Fire & Casualty Co., supra,* 219 Cal.App.3d at p. 62.) The insureds countered that even if the pipe rupture was an excluded peril under the policy, the cracking of the concrete slab was an ensuing loss not excluded from coverage. The court disagreed, holding that a separate exclusionary provision for losses caused by " 'settling, cracking, shrinking . . .' " established there was no ensuing loss caused by a covered peril. (*Id.,* at p. 65.)

In *Aetna Casualty,* the insureds argued that even if inadequate ventilation was an inherent vice, such inherent vice caused "water damage" which was a covered peril under the policy, and such covered peril ultimately caused the rotting. The court rejected this argument, finding that condensation of moisture into water, not water damage, caused the rotting, and that the insureds' construction would nearly destroy the exclusion for rot. (*Aetna Casualty & Surety Co.* v. *Yates, supra,* 344 F.2d at p. 941.)

We interpret the ensuing loss provision to apply to the situation where there is a "peril," i.e., a hazard or occurrence which causes a loss or injury,

*separate* and *independent* but resulting from the original excluded peril, and this new peril is not an excluded one, from which loss ensues. For example, in *Murray,* the initial excluded peril was the corrosion of the pipe and leakage of water, and the second resulting peril was the settling of soil.

Here, there was no peril separate from and in addition to the initial excluded peril of the welding failure and kettle rupture. The spillage of molten zinc was part of the loss directly caused by such peril, not a new hazard or phenomenon. If the molten zinc had ignited a fire or caused an explosion which destroyed the plant, then the fire or explosion would have been a new covered peril with the ensuing loss covered. That did not occur.

We therefore conclude the evidence considered in the light most favorable to the plaintiffs supports the trial court's determination that the kettle rupture and resulting damage did not constitute a covered peril or loss under the policy.[1]

IV-B., IV-C.*

. . . . . . . . . . . . . . . . . . . .

V.   *Disposition*

The judgment is affirmed.

White, P. J., and Merrill, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 11, 1990. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.

---

[1] Fireman's principal argument in support of the order of nonsuit as to the coverage issue is that recovery is barred by the one-year limitations provision in the policy. The trial court, however, did not base its order on this provision. For this reason, and because the order of nonsuit is sustainable on the ground of the latent defect exclusion, we do not review the applicability of the limitations provision here.

*See footnote, *ante,* page 170.