******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

# VIKING CONSTRUCTION, INC. *v.* 777 RESIDENTIAL, LLC, ET AL.
## (AC 41450)

Alvord, Keller and Eveleigh, Js.

*Syllabus*

The cross claim defendant insurance company, L Co., appealed to this court from the summary judgment rendered by the trial court against it in favor of the cross claim plaintiffs, who had alleged breach of contract against L Co. on the basis of its refusal to cover a claimed loss under a builder's risk insurance policy. The cross claim plaintiffs hired V Co., a general contractor, for the renovation of a high-rise building that they owned. The subcontractor, A Co., cleaned the building's concrete facade and inadvertently damaged the building's windows, which had to be replaced. Thereafter, V Co. brought an action for breach of contract against the cross claim plaintiffs, which in turn filed their cross claim after L Co. denied their claim for coverage of the loss under the policy. L Co. filed a motion for summary judgment on the cross claim, which the trial court denied, explaining that its conclusion was based on a reading of the policy's defects, errors, and omissions exclusion in conjunction with the resulting loss clause in the policy, which was an exception to that exclusion. The cross claim plaintiffs then filed a motion for summary judgment on their cross claim, which the court granted. On appeal, L Co. claimed that because the policy's defects, errors, and omissions exclusion barred coverage and the resulting loss clause did not reinstate coverage, the trial court erred in granting the motion for summary judgment filed by the cross claim plaintiffs and in denying L Co.'s motion for summary judgment. *Held*:

1. The trial court erred in rendering summary judgment in favor of the cross claim plaintiffs on their cross claim because the defects, errors and omissions exclusion of the policy unambiguously barred coverage: although the cross claim plaintiffs claimed that the defects, errors and omissions exclusion did not bar recovery because the windows were not part of the renovation, the plain meaning of the policy's exclusion, which provided, inter alia, that L Co. would not pay for loss or damage caused by an act, defect, error, or omission relating to renovation, indicated that the cleaning of the building's facade was part of the renovation and, thus, the damage to the windows, which was a direct result of that cleaning, was related to the renovation, and that conclusion was further supported by the fact that A Co.'s contractual obligations in the performance of its renovation work included avoiding harm to the windows; moreover, the claim of the cross claim plaintiffs that the defects, errors and omissions exclusion applied only to the finished product, not to the process implemented by A Co., was unavailing, as that reading of the exclusion would have rendered most of the exclusion's language superfluous by giving effect only to the portion of the exclusion that addressed the quality of the finished product and by ignoring certain other language in the exclusion; furthermore, there was no merit to the claim of the cross claim plaintiffs that the renovation endorsement would have been rendered meaningless if the exclusion applied, as the main policy form expressly limited coverage to new construction and, therefore, if the cross claim plaintiffs failed to purchase the endorsement, they would have been unable to recover for damage caused by a covered peril to the existing building they were renovating, and because the renovation endorsement was incorporated by reference into the main policy, all of the provisions of the main policy applied with equal effect.

2. The trial court incorrectly interpreted the resulting loss clause as entitling the cross claim plaintiffs to coverage: on the basis of the plain language of the resulting loss clause, which provided that, if an act, defect, error, or omission in the exclusion resulted in a covered peril, then L Co. must cover the loss or damage caused by that covered peril, a loss caused by an act during a renovation was covered if the act caused a covered peril and that latter peril damaged the building, but, in the present case, there was only one cause of the cross claim plaintiffs' loss—A Co.'s

spraying of the building, which caused damage to the windows—and that was not a covered peril; accordingly, the resulting loss clause did not apply.

Argued February 14—officially released May 28, 2019

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Hartford and transferred to the Complex Litigation Docket, where the court, *Moukawsher, J.*, granted the plaintiff's motion to cite in 777 Main Street, LLC, et al. as defendants; thereafter, the named defendant et al. filed a counterclaim and filed a cross claim against the defendant Liberty Mutual Fire Insurance Company et al.; subsequently, the named defendant et al. withdrew the counterclaim and withdrew the cross claim in part; thereafter, the plaintiff withdrew the complaint; subsequently, the court denied the motion for summary judgment on the cross claim filed by the defendant Liberty Mutual Fire Insurance Company; thereafter, the court granted the motion for summary judgment on the cross claim as to liability filed by the named defendant et al.; subsequently, the court granted the motion for judgment in accordance with the parties' stipulation filed by the named defendant et al. and rendered judgment for the named defendant et al., from which the defendant Liberty Mutual Fire Insurance Company appealed to this court. *Reversed*; *judgment directed.*

*Stephen E. Goldman*, with whom was *Wystan M. Ackerman*, for the appellant (defendant Liberty Mutual Fire Insurance Company).

*Jeffrey J. Vita*, with whom was *Theresa A. Guertin*, for the appellees (named defendant et al.).

*Opinion*

EVELEIGH, J. The cross claim defendant, Liberty Mutual Fire Insurance Company (Liberty Mutual),[1] appeals from the summary judgment rendered against it in favor of the cross claim plaintiffs, 777 Main Street, LLC (777 Main) and 777 Residential, LLC (777 Residential).[2] On appeal, Liberty Mutual argues that the trial court erred in granting the 777 entities' motion for summary judgment on their cross claim and in denying Liberty Mutual's motion for summary judgment, on the basis of its interpretation of the insurance policy issued by Liberty Mutual to the 777 entities. Specifically, Liberty Mutual argues that (1) the defects, errors, and omissions exclusion in the insurance policy bars coverage, and (2) the resulting loss clause in the policy does not reinstate coverage. We agree with Liberty Mutual and reverse the judgment of the trial court.

The following facts and procedural history are relevant to the resolution of this appeal. The 777 entities are the owners of a high-rise building at 777 Main Street in Hartford (building), which they planned to renovate and convert from an office building into a 285 unit apartment complex. On March 27, 2014, the 777 entities hired Viking Construction, Inc. (Viking), as the general contractor for the renovation. Viking's work on the renovation included cleaning the concrete facade of the building. On October 2, 2014, Viking subcontracted with Armani Restoration, Inc. (Armani), to clean the concrete facade of the building.

From September to December, 2014, Armani cleaned the building's facade using a crushed glass cleaner that was sprayed onto the building using power washers. The cleaning inadvertently damaged the building's approximately 1800 windows, all of which had to be replaced at a cost of over $4 million.

In July, 2015, the 777 entities claimed coverage of the loss under a builder's risk insurance policy (policy) that they had purchased from Liberty Mutual. This policy, which was in effect when the damage occurred, provides: "[Liberty Mutual] cover[s] direct physical loss or damage caused by a covered peril[3] to 'buildings or structures' while in the course of construction, erection, or fabrication." (Footnote added.) The policy contains several exclusions, including a "Defects, Errors, And Omissions" exclusion, which provides that Liberty Mutual is not responsible for "loss or damage consisting of, caused by, or resulting from an act, defect, error, or omission (negligent or not) relating to: a) design, specifications, construction, materials, or workmanship; b) planning, zoning, development, siting, surveying, grading, or compaction; or c) maintenance, installation, renovation, remodeling, or repair." The exclusion, however, contains an exception, also known as a "resulting loss" clause, which provides: "[I]f an act,

defect, error, or omission as described [in the exclusion] results in a covered peril, [Liberty Mutual] do[es] cover the loss or damage caused by that covered peril."

The policy also includes an optional renovation endorsement, which the 777 entities added to the policy because the project involved the renovation of an existing building rather than the construction of a new structure. The renovation endorsement provides: "[Liberty Mutual] cover[s] direct physical loss or damage caused by a covered peril to 'building materials' and 'existing buildings' that are part of [the 777 entities'] 'rehabilitation or renovation project.' "

On August 12, 2015, after investigating the 777 entities' claimed loss under the policy, Liberty Mutual denied coverage. On December 24, 2015, Viking filed an action against 777 Residential, alleging breach of contract on the basis of 777 Residential's alleged refusal "to remit the outstanding contract balance . . . for work Viking performed on the [renovation]." On May 12, 2016, Viking filed a motion to cite in as defendants, inter alia, 777 Main, Liberty Mutual, and Armani, which the court subsequently granted. On August 19, 2016, the 777 entities filed a cross claim, alleging a breach of contract on the basis of Liberty Mutual's refusal to cover the claimed loss under the policy. In March, 2017, the 777 entities settled their case with Viking and Armani for $1.6 million. The 777 entities continue to seek the remaining balance of the cost to replace the windows from Liberty Mutual.

On November 6, 2017, after the close of discovery, Liberty Mutual filed a motion for summary judgment on the cross claim. On January 11, 2018, following oral argument on the motion, the trial court denied Liberty Mutual's motion for summary judgment. In its memorandum of decision on the motion, the court explained that its conclusion was based on a reading of the policy's exclusion in conjunction with the loss peril clause.[4]

On January 31, 2018, the 777 entities filed a motion for summary judgment on their cross claim, which the court subsequently granted on February 14, 2018 "[f]or the reasons stated in the court's memorandum of decision on Liberty Mutual's motion for summary judgment . . . ." On February 16, 2018, the parties filed a stipulation as to the amount of damages. On February 20, 2018, the 777 entities filed a motion for judgment in accordance with the stipulation and Liberty Mutual filed an objection to the motion. On February 22, 2018, the court granted the motion for judgment and rendered judgment on the cross claim in the amount of $1,950,000 in favor of the 777 entities "for the reasons set forth in the court's January 11, 2018, February 14, 2018, and February 22, 2018 memoranda of decision."[5]

Thereafter, Liberty Mutual filed the present appeal. Additional facts and procedural history will be set forth

as necessary.

"We begin our analysis with the standard of review applicable to a trial court's decision to grant a motion for summary judgment. Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A party moving for summary judgment is held to a strict standard. . . . To satisfy [its] burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § [17-45]. . . . Our review of the trial court's decision to grant [a] motion for summary judgment is plenary." (Internal quotation marks omitted.) *Anderson* v. *Dike*, 187 Conn. App. 405, 409–10, 202 A.3d 448, cert. denied, 331 Conn. 910, 203 A.3d 1245 (2019).

"The general principles that guide our review of insurance contract interpretations are well settled. . . . An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract. . . . In accordance with those principles, [t]he determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . . Under those circumstances, the policy is to be given effect according to its terms. . . . When interpreting [an insurance policy], we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result. . . .

"In determining whether the terms of an insurance policy are clear and unambiguous, [a] court will not

torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. . . . Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy." (Internal quotation marks omitted.) *New London County Mutual Ins. Co.* v. *Zachem*, 145 Conn. App. 160, 164–65, 74 A.3d 525 (2013).

"[I]n the event that an insurance policy term is deemed to be ambiguous, the parties are entitled to present extrinsic evidence regarding the mutual intent of the insured and the insurer as to the scope of coverage, and the trial court must consider that evidence before applying the rule of contra proferentem to resolve the ambiguity in favor of the insured. In other words, the rule should be applied as a tie breaker only when all other avenues to determining the parties' intent have been exhausted. See *Cruz* v. *Visual Perceptions, LLC*, 311 Conn. 93, 107–108, 84 A.3d 828 (2014); see, e.g., *Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, 311 Conn. 29, 59 n.20, 84 A.3d 1167 (2014); *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, 278 Conn. 779, 788–89, 900 A.2d 18 (2006); *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 255 Conn. 295, 306, 765 A.2d 891 (2001) . . . ." (Citations omitted; footnote omitted.) *Connecticut Ins. Guaranty Assn.* v. *Drown*, 314 Conn. 161, 195–96, 101 A.3d 200 (2014) (*Rogers, C. J.*, concurring).

I

On appeal, Liberty Mutual first claims that the court erred in rendering summary judgment in favor of the 777 entities on their cross claim because the policy's "Defects, Errors, And Omissions" exclusion (exclusion) unambiguously bars coverage.[6] The 777 entities claim that the court did not err because Liberty Mutual failed to satisfy "its heavy burden of proving that [the exclusion] bars coverage for the losses."[7] We agree with Liberty Mutual.

"In an insurance policy, an exclusion is a provision which eliminates coverage where, were it not for the exclusion, coverage would have existed." (Internal quotation marks omitted.) *Hammer* v. *Lumberman's Mutual Casualty Co.*, 214 Conn. 573, 588, 573 A.2d 699 (1990). "The burden of proving that an exclusion applies is on the insurer . . . ." *Capstone Building Corp.* v. *American Motorists Ins. Co.*, 308 Conn. 760, 788 n.24, 67 A.3d 961 (2013). When policy exclusions are ambiguous, they "are strictly construed in favor of the insured . . . ." (Internal quotation marks omitted.) *Connecticut Ins. Guaranty Assn.* v. *Drown*, supra, 314 Conn. 188.

The 777 entities first argue that the exclusion does not bar recovery because the windows were not part of the renovation. On the basis of a close reading of the exclusion and its terms, we are unpersuaded.

The exclusion at issue in the present case provides: "[Liberty Mutual] do[es] not pay for loss or damage consisting of, caused by, or resulting from an act, defect, error, or omission (negligent or not) relating to: a) design, specifications, construction, materials, or workmanship; b) planning, zoning, development, siting, surveying, grading, or compaction; or c) maintenance, installation, renovation, remodeling, or repair."

Although the policy contains a definition section, many of the terms used in the provision at issue are undefined. We, therefore, look to the dictionary definition of these words to ascertain their meaning. *New London County Mutual Ins. Co.* v. *Zachem*, supra, 145 Conn. App. 166 ("[t]o determine the common, natural, and ordinary meaning of an undefined term, it is proper to turn to the definition found in a dictionary"). One such undefined word is "renovate." The verb "renovate" is defined as "to restore to a former better state (as by cleaning, repairing, or rebuilding) . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003). In the present case, the purpose of Armani's work was to restore the building to a better state by cleaning its facade. In fact, the 777 entities admitted as much in their brief, stating: "Armani was working on the facade (the *renovation* work) . . . ." (Emphasis added.) On the basis of the plain meaning of the policy, therefore, the cleaning of the building's facade was part of the renovation.

Having concluded that the cleaning of the building's facade was part of the renovation, we must next determine whether the damage to the windows, which was a direct result of this cleaning, was related to the renovation, thereby triggering the exclusion. The policy also fails to define "relating to"; therefore, we must again turn to available dictionary definitions to determine the meaning of the term. "Related" is defined as "connected by reason of an established or discoverable relation . . . ." Merriam-Webster's Collegiate Dictionary, supra. Additionally, our courts have consistently given the term "relating to" a broad meaning that comports with the dictionary definition of the term. See, e.g., *Brennan* v. *Brennan Associates*, 293 Conn. 60, 79 n.12, 977 A.2d 107 (2009) (defining "relating to" as "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with" [internal quotation marks omitted]). In the present case, the damage to the windows was not merely connected to the cleaning of the building's facade, it was a direct result of the cleaning. The 777 entities admitted this fact when they stated that "there simply are not two concurrent causes [of the loss]: Armani accidentally

sprayed the cleaning media onto the windows, causing damage." Thus, the damage to the windows was related to the renovation, as is required for the exclusion to apply.

Additionally, the parties' actions support our conclusion that the windows were part of the renovation. In their renovation plans, the 777 entities contemplated avoiding harm to the windows because the windows were not to be replaced or removed. The specifications of the contract between Viking and the 777 entities set forth Viking's and Armani's obligation to protect adjacent surfaces, which would include the windows, providing that Viking was to "[p]rotect . . . surrounding surfaces of building being restored . . . from harm resulting from concrete restoration work." Although these specifications were drafted in contemplation of the use of a chemical cleaning media, Armani had a general obligation to avoid damage to adjacent surfaces, as set forth in the "General Conditions" provision of Viking's contract with the 777 entities, which provided: "[Viking] . . . shall provide reasonable protection to prevent damage, injury or loss to . . . other property at the site or adjacent thereto, such as . . . structures and utilities not designated for removal, relocation or replacement . . . ." Because Armani's obligations in the performance of its renovation work included avoiding harm to the windows, structures not designated for removal, relocation or replacement, it is difficult to see how the windows and the damage to them is not connected or related to the renovation.

In support of its argument, Liberty Mutual cites extensively to cases from other jurisdictions. Although the majority of these cases are unpersuasive, one case, *Golan Management, LLC* v. *Hartford Ins. Co.*, United States District Court, Docket No. CIV-11-0036-C (RJC) (W.D. Okla. May 3, 2012), is instructive because it is factually similar to the present case. In *Golan Management, LLC*, the owner of a commercial building filed an insurance claim when the windows of the building were damaged as a result of exterior cleaning. Id. The insurance company denied the claim, and the building owner sued for, inter alia, breach of contract. Id. The policy in *Golan Management, LLC*, contained an exclusion that is similar to the exclusion at issue in the present case. The exclusion in *Golan Management, LLC*, provided: "[The insurer] will not pay for the cost of correcting defects in Covered Property, or loss or damage to Covered Property that was caused by, resulting from, or arising out of work done on Covered Property by [the insured], [the insured's] employees, or others working on [the insured's] behalf." (Internal quotation marks omitted.) Id. Like the 777 entities, the building owner in *Golan Management, LLC*, argued that the exclusion did not apply because "the damage was not caused by work being done to the glass, but by work being done to the building . . . ." Id. The court,

however, rejected this argument and granted the insurance company's motion for summary judgment. Id. Like the court in *Golan Management, LLC,* we are unpersuaded by the 777 entities' argument to the effect that the exclusion is applicable to the cleaning of the building's facade but not to the windows. We conclude that the ordinary meaning of the terms in the policy indicates that the exclusion applies to the windows.

The 777 entities next argue that the damage to the windows is not barred by the exclusion because the exclusion only applies to the finished product, not to the process implemented by Armani. This reading of the exclusion would render most of the exclusion's language utterly superfluous, contrary to the principle that "[an insurance] policy should not be interpreted so as to render any part of it superfluous." (Internal quotation marks omitted.) *R.T. Vanderbilt Co.* v. *Continental Casualty Co.*, 273 Conn. 448, 468, 870 A.2d 1048 (2005). This interpretation of the exclusion would ignore subsections (b) and (c) of the exclusion and only give effect to subsection (a) of the exclusion, which addresses the quality of the finished product, stating: "[Liberty Mutual] do[es] not pay for loss or damage consisting of, caused by, or resulting from an act, defect, error, or omission (negligent or not) relating to . . . design, specifications, construction, materials, or workmanship . . . ." Subsections (b) and (c) of the exclusion provide: "[Liberty Mutual] do[es] not pay for loss or damage consisting of, caused by, or resulting from an act, defect, error, or omission (negligent or not) relating to . . . b) planning, zoning, development, siting, surveying, grading, or compaction; or c) maintenance, installation, renovation, remodeling, or repair." We conclude, therefore, that the 777 entities' argument to the effect that the exclusion applies only to the finished product of Armani's work is untenable.

The 777 entities also argue that the exclusion does not bar coverage because such a reading would render the renovation endorsement meaningless. Liberty Mutual counters that, even if coverage is excluded for the damage to the windows, the endorsement has meaning because the main policy that the 777 entities purchased covered only new construction and, therefore, "without the renovation endorsement the policy wouldn't have covered *any* damage to the existing building . . . ." (Emphasis added.) Indeed, at oral argument before this court, the 777 entities stated that they purchased the endorsement to extend coverage to the existing building because the policy only covered new construction.

Although some jurisdictions assume that builder's risk policies exclusively apply to new construction; see, e.g., *Ajax Building Corp.* v. *Hartford Fire Ins. Co.*, 358 F.3d 795, 799 (11th Cir. 2004) ("The very purpose of a builder's risk policy is to provide protection for the

building under construction. . . . Just as there are standard forms of property insurance used to insure existing buildings, builder's risk policies are used to insure the building while it is in the process of being built." [Citations omitted; internal quotation marks omitted.]); in Connecticut, "[t]he scope of coverage depends on the language of the policy." D. Rosengren, 13 Connecticut Practice Series: Construction Law (2005) § 12:3, p. 245. In the present case, the main policy form expressly limits coverage to new construction. The main policy form provides: "[Liberty Mutual] cover[s] direct physical loss or damage caused by a covered peril to 'buildings or structures' while *in the course of construction*, erection, or fabrication." (Emphasis added.) It then goes on to state: "[Liberty Mutual] only cover[s] . . . 'buildings or structures' *in the course of construction* . . . ." (Emphasis added.) Thus, the 777 entities' argument that the endorsement would be rendered meaningless if the exclusion applies is without merit because, if they had failed to purchase the endorsement, they would have been unable to recover for damage caused by a covered peril to the existing building they were renovating, such as fire.

Relatedly, the 777 entities argue that the exclusion is not applicable in the present case because the renovation endorsement does not contain a copy of the exclusion. "A rider or endorsement is a writing added to or attached to a policy or certificate of insurance that expands or restricts its benefits or excludes certain conditions from coverage. . . . When properly incorporated into the policy, the policy and the rider together constitute the contract of insurance and are to be read together to determine the contract actually intended by the parties." (Internal quotation marks omitted.) *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, 290 Conn. 767, 806, 967 A.2d 1 (2009); see also *Schultz* v. *Hartford Fire Ins. Co.*, 213 Conn. 696, 705, 569 A.2d 1131 (1990) ("[i]n construing an endorsement to an insurance policy, the endorsement and policy must be read together, and the policy remains in full force and effect except as altered by the words of the endorsement" [internal quotation marks omitted]).

The 777 entities point out that "typically, endorsements to insurance policies include language incorporating the terms and conditions of the endorsement into the main policy form (or vice versa)"; however, contrary to the 777 entities' argument that the endorsement does not incorporate the terms of the main policy, the endorsement, in fact, contains the following language: "This endorsement changes the Builders' Risk Coverage." Because the renovation endorsement in the present case is incorporated by reference into the main policy, all of the provisions of the main policy apply to the endorsement with equal effect.[8] We, therefore, conclude that the exclusion unambiguously bars coverage.

## II

Liberty Mutual also claims that the trial court incorrectly interpreted the resulting loss clause as entitling the 777 entities to coverage. Specifically, Liberty Mutual claims that the clause does not apply because the "cause of the loss (Armani's negligent spraying) did not result in any second cause of loss . . . ." The 777 entities claim that, even if the exclusion applies, the court correctly interpreted the resulting loss clause as restoring coverage. Specifically, the 777 entities argue that "if Armani's acts related to facade cleaning are considered excluded, but resulted in damage to the windows, then [Liberty Mutual] should be obligated to provide coverage." We agree with Liberty Mutual.

A resulting loss clause, also known as an ensuing loss clause,[9] is an exception to a policy exclusion that "ensure[s] that if one of the specified uncovered events takes place, any ensuing loss which is otherwise covered by the property insurance policy will remain covered; the uncovered event itself, however, is never covered." 11 S. Plitt et al., Couch on Insurance (3d Ed. Rev. 2017) § 153:2, p. 153-11 n.8. "[T]he insured has the burden of proving that an exception to an exclusion reinstates coverage." *Capstone Building Corp.* v. *American Motorists Ins. Co.*, supra, 308 Conn. 788 n.24.

In order to analyze whether the resulting loss clause reinstates coverage, we must again closely examine the language of the policy. The resulting loss clause in this contract immediately follows the exclusion and provides: "But if an act, defect, error, or omission as described above results in a covered peril, [Liberty Mutual] do[es] cover the loss or damage caused by that covered peril."

Although the term "covered peril" is not defined in the policy, the provision titled "PERILS COVERED" provides: "[Liberty Mutual] cover[s] risks of direct physical loss or damage unless the loss is limited or caused by a peril that is excluded." As this provision indicates, perils, in the context of insurance, are "[t]he *cause* of a risk of loss to person or property; [especially], the cause of a risk such as fire, accident, theft, forgery, earthquake, flood, or illness . . . ." (Emphasis added.) Black's Law Dictionary (9th Ed. 2009); see also 11 S. Plitt et al., supra, p. 153-11 n.8 ("[i]n property insurance parlance, 'perils' refers to fortuitous, active, physical forces such as lightning, wind, and explosion, which bring about the loss"). On the basis of the plain language of the resulting loss clause in the present case, a loss caused by an act during a renovation will be covered if the act causes a covered peril, such as a fire, and that latter peril damages the building. In the present case, there was only one cause of the 777 entities' loss—the spraying of the building, which caused damage to the windows—and because that was not a covered peril,

the resulting loss clause does not apply.

Our reading of the policy comports with this court's interpretation of ensuing loss clauses in *Sansone* v. *Nationwide Mutual Fire Ins. Co.*, 62 Conn. App. 526, 771 A.2d 243 (2001), and *New London County Mutual Ins. Co.* v. *Zachem*, supra, 145 Conn. App. 160. In those cases, this court concluded that ensuing loss clauses apply only when there is more than one peril.

In *Sansone*, this court affirmed the judgment of the trial court and adopted its decision granting an insurer's motion for summary judgment on the basis of its conclusion that an ensuing loss clause in the insured's homeowners policy did not reinstate coverage for a loss caused by an insect infestation. *Sansone* v. *Nationwide Mutual Fire Ins. Co.*, supra, 62 Conn. App. 527–28. The policy at issue provided: "[The insurer] cover[s] direct physical loss to property . . . except that caused by . . . deterioration . . . wet or dry rot . . . birds, vermin, rodents, insects or domestic animals. . . . [A]ny ensuing loss not excluded is covered." (Internal quotation marks omitted.) *Sansone* v. *Nationwide Mutual Fire Ins. Co.*, 47 Conn. Supp. 35, 38, 770 A.2d 500 (1999), aff'd, 62 Conn. App. 526, 771 A.2d 243 (2001). The trial court concluded that the ensuing loss clause in the policy did not apply because the loss was caused by a single, excluded peril—insect infestation—and "[t]here was . . . *no aggravating activity* or event that caused [the insured's] additional losses . . . ." (Emphasis added.) Id., 39.

In *New London County Mutual Ins. Co.* v. *Zachem*, supra, 145 Conn. App. 161–63, this court was asked to interpret an ensuing loss clause in a homeowners insurance policy when the insureds claimed coverage for a loss proximately caused by vandalism. The homeowners policy at issue in *Zachem* contained a vandalism exclusion and an ensuing loss clause that limited the exclusion. Id., 162. Specifically, the ensuing loss clause provided in relevant part: "[A]ny ensuing loss to property . . . not excluded or excepted in this policy is covered." (Internal quotation marks omitted.) Id. In *Zachem*, this court concluded that the ensuing loss clause did not apply because the loss was proximately caused by an excluded peril—vandalism—and there was not a "separate and independent hazard . . . ." (Internal quotation marks omitted.) Id., 173.

Indeed, the approach to ensuing loss clauses adopted by this court is in line with the rulings of many other courts throughout the country, which hold that ensuing loss clauses apply only when a loss is caused by a separate and independent peril. See *Taja Investments*, *LLC* v. *Peerless Ins. Co.*, 717 Fed. Appx. 190, 192 (4th Cir. 2017) ("an ensuing loss provision . . . applies only to distinct, separable, and ensuing losses" [internal quotation marks omitted]); *Travelers Indemnity Co.* v. *Board of County Commissioners*, 508 Fed. Appx. 733,

734–35 (10th Cir. 2013) ("exception provides for coverage only when the excluded cause . . . becomes a new causal agent that itself causes resultant property damage" [internal quotation marks omitted]); *Sapiro* v. *Encompass Ins.*, 221 F.R.D. 513, 522 (N.D. Cal. 2004) ("courts have long defined an ensuing loss as a loss separate and independent from [an] original peril" [internal quotation marks omitted]); *H.P. Hood, LLC* v. *Allianz Global Risks US Ins. Co.*, 88 Mass. App. 613, 619, 39 N.E.3d 769 (2015) (resulting loss clause inapplicable because cause of loss was "not one where an excluded occurrence involving initial property damage led to other property damage of a different kind"), review denied, 473 Mass. 1111, 44 N.E.3d 862 (2016); *Weeks* v. *Co-Operative Ins. Cos.*, 149 N.H. 174, 177, 817 A.2d 292 (2003) (concluding that cause of loss separate and independent from initial excluded loss is required for ensuing loss clause to apply); see also *Acme Galvanizing Co.* v. *Fireman's Fund Ins. Co.*, 221 Cal. App. 3d 170, 179–80, 270 Cal. Rptr. 405 (1990) (same), review denied, California Supreme Court, Docket No. S016534 (Cal. October 11, 1990).

The New Hampshire Supreme Court's decision in *Weeks* v. *Co-Operative Ins. Cos.*, supra, 149 N.H. 174, and the decision of the California Court of Appeal in *Acme Galvanizing Co.* v. *Fireman's Fund Ins. Co.*, supra, 221 Cal. App. 3d 170, are illustrative of the circumstances in which, as here, ensuing loss clauses are inapplicable. In *Weeks*, a brick veneer wall was damaged when it separated from an asphalt shingle wall because of faulty workmanship. *Weeks* v. *Co-Operative Ins. Cos.*, supra, 174. The insurance policy that covered the building excluded losses that were a result of faulty workmanship, but contained a resulting loss clause under which the building owner sought coverage. Id., 174–75. The court in *Weeks* concluded that the resulting loss clause did not apply because "there was no subsequent ensuing cause of loss separate and independent" from the faulty workmanship. Id., 177–78. In reaching this conclusion, the court in *Weeks* cited the decision of the California Court of Appeal in *Acme Galvanizing Co.* Id., 177.

In *Acme Galvanizing Co.* v. *Fireman's Fund Ins. Co.*, supra, 221 Cal. App. 3d 173, an improperly welded steel kettle filled with several tons of molten zinc ruptured, thereby spilling the zinc onto nearby equipment in the plaintiff's galvanizing plant. The rupture was a result of a latent defect in the kettle, and the plaintiff's insurance policy excluded from coverage losses caused by such defects. Id., 179. The plaintiff argued, however, that the damage caused by the welding failure should be covered under the policy's ensuing loss clause. Id. The court disagreed and concluded: "[T]here was no peril separate from and in addition to the initial excluded peril of the welding failure and kettle rupture. The spillage of molten zinc was part of the loss directly

caused by such peril, not a new hazard or phenomenon. If the molten zinc had ignited a fire or caused an explosion which destroyed the plant, then the fire or explosion would have been a new covered peril with the ensuing loss covered. That did not occur." Id., 180. Just as in *Weeks* and *Acme Galvanizing Co.*, the loss in the present case was caused by a single, excluded peril, and, therefore, the ensuing loss clause similarly does not reinstate coverage.

The 777 entities argue, however, that *Sansone* and *Zachem* are distinguishable and that, therefore, the independent peril approach to ensuing loss clauses that they set forth is inapplicable to the present case. In an effort to distinguish these cases, the 777 entities rely on the fact that the ensuing loss clause provisions in those cases contained different language than the resulting loss clause in the present case. Although the policies in *Sansone* and *Zachem* use the term "ensuing loss," while the policy in the present case uses the language "results in a covered peril," this difference is immaterial. It is undisputed that the clause in the present case is a "resulting loss" provision and, as discussed previously in this opinion; see footnote 9 of this opinion; ensuing loss and resulting loss clauses are substantively indistinguishable. The clauses in *Sansone* and *Zachem* and the clause in the present case all serve the same purpose—reinstating coverage if an excluded peril causes a covered peril, which, in turn, results in a loss.

The 777 entities also attempt to distinguish *Sansone* and *Zachem* by pointing out that those cases involved multiple, concurrent causes of the claimed loss, while the present case only involves one peril. Contrary to the 777 entities' argument, the fact that the loss in the present case was the result of a single, uncovered peril does not make the reasoning of *Sansone* and *Zachem* inapplicable. In both of those cases, the court made clear that an ensuing loss clause will only reinstate coverage when a hazard *other* than the excluded peril causes the loss. These cases clearly indicate that, as in the present case, where an excluded peril—the cleaning of the building's facade as part of the renovation—was the sole and direct cause of the damage to the windows, the ensuing loss clause does not reinstate coverage.[10]

The judgment is reversed and the case is remanded with direction to deny the 777 entities' motion for summary judgment on the cross claim, to grant Liberty Mutual's motion for summary judgment and to render judgment on the cross claim for Liberty Mutual.

In this opinion the other judges concurred.

[1] Although the complaint in the underlying action was filed by Viking Construction, Inc., against Liberty Mutual and 777 Residential, LLC, Viking Construction, Inc., withdrew from the case and is not a party to this appeal. This appeal arises out of a cross claim filed by 777 Main Street, LLC, and 777 Residential, LLC, against their insurer, Liberty Mutual, and other entities which are not parties to this appeal.

[2] Hereinafter, we refer to 777 Main and 777 Residential collectively as the 777 entities, and individually by name where appropriate.

[3] The policy does not expressly define "covered peril," however, under the heading "PERILS COVERED," it provides: "[Liberty Mutual] cover[s] risks of direct physical loss or damage unless the loss is limited or caused by a peril that is excluded." For specific examples of the kinds of "covered perils" contemplated by the policy, it is helpful to look to the definition section of the policy, which provides in relevant part: "Specified perils means aircraft; civil commotion; explosion; falling objects; fire; hail; leakage from fire extinguishing equipment; lightning; riot; sinkhole collapse; smoke; sonic boom; vandalism; vehicles; volcanic action; water damage; weight of ice, snow, or sleet; and windstorm." (Internal quotation marks omitted.)

[4] Specifically, in its January 11, 2018 memorandum of decision denying Liberty Mutual's motion for summary judgment, the trial court stated: "The decisive question for this summary judgment motion is what it means when a builder's risk insurance policy with a renovation endorsement excludes damage 'resulting from an act . . . relating to . . . construction, workmanship, [or] renovation.' . . .

"Everyone agrees that the 'renovations' exclusion . . . excludes insurance coverage for things done to the building that amount to nothing more than a bad job of renovating the thing intended to be renovated. But it's less clear whether there is coverage when a careless worker renovating one part of the building damages another part of the building.

"The answer lies in the policy's additional language. It says that if an act of renovation 'results in a covered peril,' damage from that covered peril is covered. . . . In this context, the language reasonably appears to mean that if the renovation 'results' in damage that isn't a renovation, the latter damage is covered despite being triggered by the former. The [777 entities] reasonably [take] this to mean that damage to a part of the building not being renovated by the worker—a window—is covered. . . .

"But Liberty Mutual says the language is intended to provide coverage only where there are two independent perils: one excluded peril causing an independent peril that causes the damage. A contractor cleaning the facade drops a wrench that breaks a wire that ultimately causes a fire that damages the building. The second peril—the covered one—is the fire. A facade cleaner leaves open a window that lets in rain that damages a carpet. The second peril—the covered one—is the rain. . . .

"The important thing for the special clause here—often called a 'resulting loss' clause—is that the worker wasn't renovating the window but damaged it. The only point of getting this extra renovations policy would be to protect against collateral damage to the building during the renovations. It doesn't cover any other kind of damage—to people or other property, for instance." (Emphasis omitted; footnotes omitted.)

[5] The court's January 11, 2018 memorandum of decision denying Liberty Mutual's motion for summary judgment, which the court referenced in its subsequent memoranda of decision, provides the only detailed explanation of the court's rationale for its decision to render summary judgment in favor of the 777 entities.

[6] In its January 11, 2018 memorandum of decision denying Liberty Mutual's motion for summary judgment, the trial court did not indicate whether coverage was barred by the exclusion; instead, it based its conclusion that the 777 entities were entitled to coverage upon its reading of the exclusion in conjunction with the resulting loss clause. The resulting loss clause, however, only may be considered when coverage is barred by the exclusion. For the purposes of our analysis, therefore, we must infer that the court found that the exclusion barred coverage.

[7] Specifically, the 777 entities argue that the exclusion does not apply because (1) the windows were not part of the renovation; (2) the exclusion only applies to workmanship; (3) the application of the exclusion would obviate the renovation endorsement; (4) the exclusion is not incorporated into the renovation endorsement; and (5) the exclusion is ambiguous and should be construed in their favor. We address each of these arguments in turn.

[8] Finally, the 777 entities argue that, at a minimum, the exclusion is ambiguous and, therefore, must be construed in their favor. Because we conclude that the exclusion unambiguously bars coverage, we need not address this argument. See, e.g., *Amica Mutual Ins. Co.* v. *Piquette*, 176 Conn. App. 559, 565, 168 A.3d 623 (2017) ("[A]ny ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy. . . . This rule of construction may not be

applied, however, unless the policy terms are indeed ambiguous." [Internal quotation marks omitted.]).

[9] Although the exception at issue in the present case does not use the term "ensuing loss," courts in other jurisdictions have stated that resulting loss clauses and ensuing loss clauses are one and the same. See, e.g., *Erie Ins. Property & Casualty Co.* v. *Chaber*, 239 W. Va. 329, 337 n.8, 801 S.E.2d 207 (2017) ("Whether an insurance policy uses the term ensuing loss or resulting loss is of no moment. Resulting loss clauses are sometimes denominated ensuing loss clauses. The distinction is simply a matter of different wording among insurance policies. There is no legal significance to using one phrase over the other." [Internal quotation marks omitted.]).

[10] Alternatively, the 777 entities argue that, even if this court does not interpret the ensuing loss clause as reinstating coverage, "it should deny Liberty Mutual's motion [for summary judgment] and leave it to the trier of fact to determine whether the ensuing loss provision applies in this case [because wind, which would be considered a covered peril, might have caused the loss]." In support of their argument, the 777 entities cite the self-serving deposition testimony of employees of Viking and Armani that the damage to the windows *might* have been caused by wind because they sometimes noticed that it seemed windy while they were cleaning the building. The 777 entities, however, admitted that there was only one cause of the damage—the faulty spraying of the building's facade. Thus, we conclude that this argument is without merit.