**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
SEPTEMBER 15, 2022

_González C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
SEPTEMBER 15, 2022

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| SEATTLE TUNNEL PARTNERS, a Washington joint venture; and WASHINGTON STATE DEPARTMENT OF TRANSPORTATION, | ) ) ) ) | No. 100168-1 |
| Petitioners, | ) ) | |
| HITACHI ZOSEN U.S.A. LTD., | ) ) | |
| Intervenor-Petitioner, | ) ) | En Banc |
| v. | ) ) | |
| GREAT LAKES REINSURANCE (UK) PLC, a foreign insurance company; ZURICH AMERICAN INSURANCE PLC, a New York insurance company; STARR SURPLUS LINES INSURANCE COMPANY, an Illinois insurance company; INDIAN HARBOR INSURANCE COMPANY, a Connecticut insurance company; ALLIANZ GLOBAL CORPORATE & SPECIALTY SE, a foreign insurance company; TORUS INSURANCE (UK) LIMITED, a foreign insurance company; PARTNERRE IRELAND INSURANCE LIMITED, a foreign insurance company; DOES 1-100, individual and/or corporate members of SYNDICATE 382 at LLOYD'S, LONDON; and DOES 101-200, individual and/or corporate members of SYNDICATE 1882 at LLOYD'S, LONDON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Filed: <u>September 15, 2022</u> |
| Respondents. | ) ) ) | |

*Seattle Tunnel Partners, et ano. v. Great Lakes Reinsurance (UK) PLC, et al.*, No. 100168-1

JOHNSON, J.—This consolidated case concerns the interpretation of a builder's "all-risk" insurance policy. Petitioners—Washington State Department of Transportation (WSDOT) and Seattle Tunnel Partners (STP)—seek reversal of a published Court of Appeals decision affirming the partial summary judgment rulings that the insurance policy does not provide coverage for certain losses. At issue in WSDOT's petition for review is whether the loss of use or functionality of the insured property constitutes "physical loss" or "physical damage" that triggers coverage. STP's petition asks whether the insurance policy excludes coverage for damage to the insured property caused by alleged design defects and whether the policy covers delay losses. Intervenor-petitioner Hitachi Zosen U.S.A. Ltd. joins in STP's petition for review but not in WSDOT's petition and joins only in the issue concerning the exclusion for alleged design defects.[1]

This case arises out of a major construction project to replace the Alaskan Way Viaduct in Seattle. In 2011, STP contracted with WSDOT to construct a tunnel to replace the viaduct. As part of the agreement, STP obtained a builder's all-risk insurance policy (Policy) from Great Lakes Reinsurance (UK) PLC and several other underwriters[2] (collectively Great Lakes). The Policy named STP and

---

[1] Hitachi joined the action as an intervenor-plaintiff. Hitachi designed and manufactured the tunnel boring machine.

[2] Great Lakes Reinsurance is joined by the following insurance underwriters: Allianz Global Corporate and Specialty SE, PartnerRe Ireland Insurance Limited, Indian Harbor Insurance Company, Zurich American Insurance Company, Torus Insurance (UK) Limited, Syndicate 382 at Lloyd's of London, Syndicate 1882 at Lloyd's of London, and Starr Surplus

WSDOT as insureds. This Policy insured against damage to both the tunneling works and the tunnel boring machine (TBM). "Section 1" of the Policy concerned the tunneling works and "Section 2" concerned the TBM. The tunneling works refer to "the tunnel itself during the course of construction, and property being used or intended for use in the construction of the tunnel (except the TBM)." Clerk's Papers (CP) at 4695.

The TBM began operating in July 2013. In December 2013, after excavating part of the tunnel, the machine stopped working. The TBM did not resume mining until December 2015. The project was unable to continue during the two-year period while the TBM was disassembled, removed, and repaired. STP and WSDOT tendered insurance claims under the Policy. Great Lakes denied coverage, and STP and WSDOT sued the insurers, alleging wrongful denial of their claims.

The parties filed a series of cross motions for partial summary judgment. The motions raised various issues relating to the interpretation of the Policy. The trial court granted Great Lakes' motions and denied petitioners' motions. Relevant to this case, the trial court ruled, as a matter of law, that (1) the "Machinery Breakdown Exclusion" (MBE) in Section 2 "excludes coverage for property damage to the TBM caused by any alleged design defects," (2) the Policy does not

---

Lines Insurance Company. Vulcan LLC and United Policyholders filed amici briefs in support of petitioners.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

afford coverage for losses due to project delays, and (3) the loss of use or functionality of the tunnel does not constitute "'direct physical loss, damage, or destruction'" that is covered by the Policy. CP at 2516, 8911. After granting discretionary review, the Court of Appeals affirmed these partial summary judgment rulings. We affirm the Court of Appeals.

ANALYSIS

I.      Standard of Review

"'This court reviews summary judgment determinations de novo, engaging in the same inquiry as the trial court. Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.'" *Kut Suen Lui v. Essex Ins. Co.*, 185 Wn.2d 703, 709-10, 375 P.3d 596 (2016) (citation omitted) (quoting *Durland v. San Juan County*, 182 Wn.2d 55, 69, 340 P.3d 191 (2014)). Washington courts interpret language in insurance policies as a matter of law, and this court reviews de novo a lower court's interpretation of policy language. *Kut Suen Lui*, 185 Wn.2d at 710.

The issues presented in this case require us to interpret language in the Policy to determine whether, as a matter of law, the alleged specified loss is covered. Specifically, we are asked to determine (1) whether a design defect is an internal cause of damage that falls within the MBE, (2) whether the Policy's basis

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

of indemnity provision covers losses due to project delays, and (3) whether physical loss or damage includes loss of use or functionality.

Petitioners do not challenge the rules we apply when interpreting insurance contracts. They challenge the Court of Appeals' application of those rules and the outcome. Rules for interpreting insurance contracts are well settled. We construe insurance policies as a whole and give the language "'a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.'" *Queen Anne Park Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 183 Wn.2d 485, 489, 352 P.3d 790 (2015) (internal quotation marks omitted) (quoting *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 126 Wn.2d 50, 65, 882 P.2d 703, 891 P.2d 718 (1994)). Where a term is not defined in the policy, it is assigned its "'plain, ordinary, and popular meaning.'" *Queen Anne Park*, 183 Wn.2d at 491 (quoting *Queen City Farms*, 126 Wn.2d at 77).

"'[I]f the policy language is clear and unambiguous, we must enforce it as written; we may not modify it or create ambiguity where none exists.'" *Kut Suen Lui*, 185 Wn.2d at 712 (alteration in original) (quoting *Quadrant Corp. v. Am. States Ins. Co.*, 154 Wn.2d 165, 171, 110 P.3d 733 (2005)). If the language is ambiguous, we take additional steps in our interpretation analysis. Language in an insurance contract is ambiguous if, on its face, it is fairly susceptible to two different but reasonable interpretations. *Kut Suen Lui*, 185 Wn.2d at 712.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

II.     Machinery Breakdown Exclusion

STP first challenges the Court of Appeals holding that design defects fall within the MBE. The Policy at issue is a builder's "all-risk" policy. In an all-risk policy, the applicable rule is "'any peril that is not *specifically* excluded in the policy is an insured peril.'" *Vision One, LLC v. Phila. Indem. Ins. Co.*, 174 Wn.2d 501, 513, 276 P.3d 300 (2012) (some emphasis omitted) (quoting *Findlay v. United Pac. Ins. Co.*, 129 Wn.2d 368, 378, 917 P.2d 116 (1996)). Once the insured shows the loss falls within the scope of the policy's coverage, the burden shifts to the insurer to show "the loss is excluded by specific policy language" in order to avoid coverage. *McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 731, 837 P.2d 1000 (1992).

Here, the Policy's insuring clause provided that the insurers would cover "direct physical loss, damage or destruction (hereinafter referred to as 'Damage') not specifically excluded herein . . . to the Interest Insured." CP at 135. It is undisputed that the TBM (the insured interest) suffered "physical loss, damage or destruction." The question is whether one of the alleged causes of that damage falls within the Policy's MBE.

The cause (or causes) of damage to the TBM is disputed between the parties. All parties appear to agree that the damage may have resulted from one or more of the following: design defects in the TBM, operator error, and/or the encounter with

a steel well casing. The cause of the damage remains a question of fact left to be resolved by a fact finder. The question before this court is whether, as a matter of law, the MBE excludes coverage for damage to the TBM caused by the TBM's *alleged* design defects.

Great Lakes investigated and determined that the "TBM sustained a machinery breakdown due to the fact that it was improperly designed, under dimensioned, and had an inadequate lubrication system. Overall, the TBM was not fit for the specified purpose." CP at 2901. "Stated differently, the 'under dimensioned' design and the lubrication system caused the TBM to operate improperly and/or cease operating." CP at 2901. STP understood this to mean that Great Lakes concluded the cause of the damage to the TBM was the TBM's own defective design. Based on this conclusion, Great Lakes denied coverage.

In its suit against Great Lakes, STP filed a summary judgment motion, arguing that Section 2 of the Policy did not exclude coverage for damage caused by alleged design defects. Great Lakes filed a cross motion. The trial court denied STP's motion and granted Great Lakes' cross motion. It ruled, "as a matter of law," that the MBE "excludes coverage for property damage to the TBM caused by any alleged design defects." CP at 2516. The Court of Appeals affirmed, reasoning that the MBE excludes losses due to internal causes of damage, and a design defect constitutes an internal cause of damage.

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The parties disagree over whether a design defect constitutes an internal cause of damage. Looking at the Policy language, undefined terms in an insurance policy are given their plain, ordinary, and popular meaning in accord with the understanding of the average purchaser of insurance. We will often turn to the dictionary definition of an undefined term to determine its meaning.

Section 2 of the Policy, which concerns the TBM, includes the MBE exclusion. The MBE reads, "[The insurers] will not indemnify the Insured [for] . . . [l]oss of or [d]amage in respect any item by its own explosion mechanical or electrical breakdown, failure breakage or derangement." CP at 3696, 3865. STP highlights that the exclusion is "missing words and punctuation" and opine that it is "garbled." STP's Suppl. Br. at 2, 20. STP does not make a specific ambiguity argument. It argues that "the very most Insurers can establish is the machinery breakdown exclusion . . . is arguably ambiguous." STP's Suppl. Br. at 19 (emphasis omitted). STP does not explain how any missing word or punctuation makes the MBE fairly susceptible to two different but reasonable interpretations.

The Court of Appeals, in analyzing this provision, concluded that "any item" means the component parts of the TBM. After reviewing dictionary definitions of "any" and "item," the court concluded these definitions "imply numerosity and unambiguously indicate that the section 2 MBE excludes coverage for breakdown of a single part of the TBM, not the entire TBM." *Seattle Tunnel Partners v. Great*

*Seattle Tunnel Partners, et ano. v. Great Lakes Reinsurance (UK) PLC, et al.*, No. 100168-1

*Lakes Reinsurance (UK), PLC*, 18 Wn. App. 2d 600, 612, 492 P.3d 843 (2021),

*review granted*, 198 Wn.2d 1032 (2022) (*STP*). STP does not seem to challenge

this interpretation of "any item." The Court of Appeals noted that "[t]his issue is

consequential with respect to the MBE's 'resultant [d]amage' clause. . . . [I]f 'any

item' means a part of the TBM, then the MBE would not exclude damage to the

TBM caused by a defective part." *STP*, 18 Wn. App. 2d at 610 n.6 (second

alteration in original).[3]

The phrase "by its own" is also not disputed. The Court of Appeals

concluded that "by its own" indicates the MBE excludes coverage for *internal*

causes of damage. That is to say, the MBE would not exclude coverage for a

machinery breakdown caused by an "external" peril. Both Great Lakes[4] and STP

agree that the MBE excludes coverage for internal causes of damage. Opening Br.

of Pet'r STP at 16 (Wash. Ct. App. No. 78691-1-I (2019)) ("By adding [the

limiting phrase "by its own"], the Insurers limited the machinery breakdown

exclusion to internal—as opposed to external—causes."). The Court of Appeals

supports this conclusion by citing to cases from other states. *See Connie's Constr.*

*Co. v. Cont'l W. Ins. Co.*, 227 N.W.2d 204, 207 (Iowa 1975) (holding that a

---

[3] Great Lakes did not appeal this ruling.

[4] According to Great Lakes, "[i]t is undisputed that the policy would respond to damage to the TBM due to an external peril such as a collapse, fire, flood, or earthquake, because such perils—which are precisely what the parties intended the policy to insure against—would clearly not involve the TBM's 'own . . . mechanical or electrical breakdown.'" Resp'ts' Resp. to Amicus Curiae Mem. at 24 (second alteration in original).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

mechanical breakdown is a functional defect in machinery and that an MBE did not exclude coverage because in that case the breakdown of a crane was caused by user error); *Caldwell v. Transp. Ins. Co.*, 234 Va. 639, 644, 364 S.E.2d 1 (1988) (holding that an MBE "is restricted to losses arising from internal or inherent deficiency or defect, rather than from any external cause"); *James W. Fowler Co. v. QBE Ins. Corp.*, 474 F. Supp. 3d 1149, 1160-61 (D. Or. 2020) (adopting *Caldwell*'s reasoning to interpret a similar MBE), *rev'd*, 2021 WL 4922552 (mem.).

STP does not appear to challenge the Court of Appeals' conclusion that "by its own" means the MBE is limited to internal causes of damage, and we agree. The term "by its own" is undefined in the Policy and is assigned its plain and ordinary meaning by looking to the dictionary definition of the words. In this context, the word "by" is used as a preposition and means "in consequence of" or "as a result of." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 307 (2003). "Its," a possessive noun, is defined as "belonging to it," "itself as possessor," "inherent in it," or "associated or connected with it." WEBSTER'S, *supra*, at 1204. Finally, the adjective "own" is defined as "belonging to oneself or itself." WEBSTER'S, *supra*, at 1612. Applying these definitions, "by its own" refers to something that is internal, inherent, or belonging to the TBM. Therefore, consistent with the plain, ordinary meaning of the phrase "by its own," we agree with the

10

*Seattle Tunnel Partners, et ano. v. Great Lakes Reinsurance (UK) PLC, et al.*, No. 100168-1

Court of Appeals that the MBE excludes from coverage inherent or internal causes of damage.

The dispute between the parties then is whether the TBM's alleged design defect constitutes an "internal" or "external" cause of damage. The Court of Appeals concluded that a design defect is an internal cause because "design defects are inherent to the insured subject matter. . . . [and] a product's design is something inherent to it and inseparable from it." *STP*, 18 Wn. App. 2d at 614, 616. The court applied the reasoning from out-of-state cases *GTE Corp. v. Allendale Mutual Insurance Co.*, 372 F.3d 598 (3d Cir. 2004), and *Acme Galvanizing Co. v. Fireman's Fund Insurance Co.*, 221 Cal. App. 3d 170, 270 Cal. Rptr. 405 (1990), opining that they "offer a convincing rationale as to why we should view a design defect as an internal cause of damage."[5] *STP*, 18 Wn. App. 2d at 616.

Looking at the cases, in *GTE* the insured sued its all-risk insurers, seeking to recover the costs it incurred in remediating its computer system to avoid "Y2K" (the year 2000) date-recognition problems. In essence, the program was unable to properly read dates on or after the year 2000. The computer system's "Y2K

---

[5] STP generally takes issue with the Court of Appeals reliance on select decisions from other jurisdictions and argues that the court did not adequately consider the two out-of-state cases the petitioners cited in their briefing: *N-Ren Corp. v. American Home Assurance Co.*, 619 F.2d 784 (8th Cir. 1980), and *Standard Structural Steel Co. v. Bethlehem Steel Corp.*, 597 F. Supp. 164 (D. Conn. 1984). To decipher the meaning of the policy language, Washington courts apply well-settled rules of insurance policy interpretation. But opinions from other jurisdictions are also instructive.

*Seattle Tunnel Partners, et ano. v. Great Lakes Reinsurance (UK) PLC, et al.*, No. 100168-1

problem" was the cause of the loss the insureds incurred, and the issue was whether that specific cause of loss fell within the insurance policy's defective design exclusion. The court concluded the Y2K threat was a design defect because there was an "'imperfection or shortcoming' . . . in the system's design or specification." *GTE*, 372 F.3d at 610 (quoting BLACK'S LAW DICTIONARY 429 (7th ed. 1999)). In explaining that the loss was caused by a design defect, the court reasoned that the cause of the loss was not "some external threat." *GTE*, 372 F.3d at 609. Rather, "the system performed in exactly the manner it was designed to operate" and was inadequate. *GTE*, 372 F.3d at 609. The insured argued the Y2K threat was an external threat that could not be considered a design defect. The court rejected that argument, explaining:

> We disagree with the suggestion that the Y2K threat is "external" merely because GTE's systems interacted with other systems or read data from outside sources. Such a conception of external would essentially allow all defective designs and inherent vices to be characterized as external problems. For example, if a car is defectively designed so that the tires come off when the car is driven at 10 miles per hour, the threat is not external merely because the "external" event of the road contacting the tire caused the tires to fly off. The road contacting the tire is an entirely predictable event that is inherent to the very function and purpose of the automobile— there is no problem independent of the automotive design. To take another example, if a dam whose very purpose is to hold water falls apart when the water rises to an entirely predictable level, the rising of the water is not an "external" problem—the problem is that the dam was not properly designed to allow it to perform precisely the function it was intended to perform, the holding of water.

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*GTE*, 372 F.3d at 612. The Court of Appeals below found the Third Circuit Court of Appeals' reasoning persuasive in support of its ruling that a design defect is internal.

The Court of Appeals below also considered *Acme*. In that case the court interpreted an express "latent defect/inherent vice" exclusion to determine the meaning of "latent." *Acme*, 221 Cal. App. 3d 170. The California court concluded that a defect in design is a latent defect. Here, the Court of Appeals reasoned that *Acme*'s analysis was relevant because "latent defect," "inherent defect," and "internal cause" have been used interchangeably. *STP*, 18 Wn. App. 2d at 616 n.12. Applying the reasoning of these two cases, the Court of Appeals ruled a design defect is internal. STP challenges this ruling and cites to *N-Ren* and *Standard Structural Steel* to support its position that a design defect is an external cause of damage. *N-Ren Corp. v. Am. Home Assur. Co.*, 619 F.2d 784 (8th Cir. 1980); *Standard Structural Steel Co. v. Bethlehem Steel Corp.*, 597 F. Supp. 164 (D. Conn. 1984).

In contrast, in *N-Ren* the Eighth Circuit Court of Appeals concluded that a design error is an external cause. The court in *N-Ren* applied the "Pollack test" to conclude that the design errors in that case "must be considered external causes of the loss to the insured." 619 F.2d at 788. The court derived the "Pollack test" from *Contractors Realty Co. v. Insurance Co. of North America*, 469 F. Supp. 1287

13

*Seattle Tunnel Partners, et ano. v. Great Lakes Reinsurance (UK) PLC, et al.*, No. 100168-1

(S.D.N.Y. 1979), where Judge Pollack listed three types of losses that are not covered under an insurance policy that only covered external causes of loss. The court explained that a loss that results from a design error did not "clearly . . . fit" within any of the three types of losses identified in the "Pollack test." *N-Ren*, 619 F.2d at 788.

The Court of Appeals here found *N-Ren* to be unpersuasive, noting that this case is not instructive because the conception of a product's design is inherent to the product itself and the categorization of losses under the Pollack test was an outlier. Here, we do not have a similar categorization of loss nor are the petitioners suggesting we adopt such a categorization or analysis.

In *Standard Structural Steel*, the Connecticut court concluded that the design defect was an external cause of damage under the particular facts of the case. The "design defect" at issue there was the insured's "negligence in constructing the cable guides contrary to the engineering specifications and blueprints." *Standard Structural Steel*, 597 F. Supp. at 194. The court noted that had the property been constructed "as the plans called for, no accident and resulting damage would have occurred." *Standard Structural Steel*, 597 F. Supp. at 194. In other words, "[t]he causative agent of damage resulting from this design defect did not emanate from an inherent vice within the property itself . . . . It came from negligently failing to follow the engineering specifications." *Standard Structural Steel*, 597 F. Supp. at

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

195. In explaining what constitutes an "external" cause, the court highlighted what it is not: "A cause is external if damage which arises from it does not result wholly 'from an inherent defect in the subject matter or from the inherent deficient qualities, nature and properties of the subject matter.'" *Standard Structural Steel*, 597 F. Supp. at 193 (quoting *Compagnie des Bauxites de Guinee v. Ins. Co. of N. Am.*, 566 F. Supp. 258, 261 (W.D. Pa. 1983)). The Court of Appeals below found this reasoning to be consistent with its own conclusion that a design defect is something inherent to the TBM and therefore is an internal cause of harm. *STP*, 18 Wn. App. 2d at 616 n.13.

Applying the rules of insurance policy interpretation, we hold that a design defect is internal to the insured property, and we agree with the out-of-state cases that are consistent with this conclusion. The phrase "design defect" does not appear in the MBE, but we may still rely on our contract interpretation framework to aid in determining whether a "design defect" constitutes an internal cause of damage. Turning to the dictionary definitions, to "design" is to plan or "devise or propose for a specific function." WEBSTER'S, *supra*, at 611. A "defect" is the "absence of something necessary for completeness, perfection, or adequacy in form or function." WEBSTER'S, *supra*, at 591. To be "defective" means to "fall[] below an accepted standard . . . in adequacy of function." WEBSTER'S, *supra*, at 591. And "defectibility" is defined as an "inherent defectiveness." WEBSTER'S, *supra*, at 591.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The ordinary, plain meaning of the phrase indicates that a design defect is internal to the insured property.

When interpreting an insurance policy, we give it a "practical and reasonable interpretation rather than a strained or forced construction that leads to an absurd conclusion, or that renders the policy nonsensical or ineffective." *Transcon. Ins. Co. v. Wash. Pub. Utils. Dists.' Util. Sys.*, 111 Wn.2d 452, 457, 760 P.2d 337 (1988). While exclusions should be strictly construed against the insurer, a strict application should not contradict the plain, clear language such that a strained or forced construction results. *Kut Suen Lui*, 185 Wn.2d at 712.

STP argues we should conclude that a design defect is an external cause of damage. STP explains that "while the manifestation of a design defect may be internal to the TBM, any such defect would have been caused by an engineer, architect, or other such designer at a distant location months or years prior to construction." STP's Suppl. Br. at 19. By way of this argument, STP attempts to draw our attention to what it calls the "precipitating event" that caused the design defect rather than focus on the design defect itself as the cause of the machinery breakdown. STP's Suppl. Br. at 19. We reject this argument as inconsistent with established principles of insurance policy interpretation.

STP's interpretation of design defect would recharacterize the cause of the TBM's damage by pointing to some distant but-for cause as the true source. We

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

rejected this type of reasoning in *Vision One* while discussing an insurance policy's resulting loss clause. In that case, the focus was on *subsequent* events as a but-for cause of damage, whereas here the petitioners point to "precipitating" events that led to the existence of the design defect. In *Vision One*, we noted:

> "As an 'all-risk' policy, this insurance policy basically covers everything unless specifically excluded. That means the number of possibilities for last-in-time 'but for' causes of damage are limited only by the imagination of the reader. . . . What if faulty construction allows humid summer air to enter the building, which rusts metal fixtures? But for the exposure to the summer air, no damage to the fixtures would have occurred. Yet the contract does not exclude damages caused by 'air.' Coverage? What if a poorly constructed ceiling beam falls, smashing the floor below? But for the force of gravity, no damage to the floor would have occurred. Yet the contract does not exclude damages caused by 'gravity.' Coverage?"

174 Wn.2d at 516 (alteration in original) (quoting *TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 576-77 (6th Cir. 2010)).

STP's interpretation raises similar concerns. The MBE excludes internal causes of machinery breakdown. The plain, ordinary, and popular meaning of the term "design defect" can be understood as an inadequacy in function that is inherent to or part of the product itself. The assertion—that a design defect is an external cause because but for the engineer who developed the defective design, the TBM would not have suffered damage—is unconvincing. It would be an unreasonable interpretation to conclude that an internal cause of damage "that is

*Seattle Tunnel Partners, et ano. v. Great Lakes Reinsurance (UK) PLC, et al.*, No. 100168-1

clearly an excluded risk under the policy was meant to become compensable because in a philosophical sense it can also be classified"[6] as an external cause. In sum, we conclude a design defect constitutes an internal cause of damage consistent under the ordinary meaning of the terms at issue here.

STP further argues that Section 2 of the Policy must provide coverage for damage caused by design defects because it does not contain an explicit "design defects" exclusion. To support its argument that any design defect exclusion must be explicit, STP argues that under Washington law, exclusions in an all-risk policy must be specific, clear, and unequivocal, citing *International Marine Underwriters v. ABCD Marine, LLC*, 179 Wn.2d 274, 288, 313 P.3d 395 (2013) (plurality opinion) ("if insurers want exclusions upheld, they have the burden of drafting them in 'clear' and 'unequivocal' terms."); *Vision One*, 174 Wn.2d at 513 (stating an all-risk policy provides coverage for perils unless the peril is specifically excluded); *Moeller v. Farmers Ins. Co. of Wash.*, 173 Wn.2d 264, 272, 267 P.3d 998 (2011) (stating exclusions will not be extended beyond their "clear" and "unequivocal" meaning); STP's Suppl. Br. at 8-9.

Respondent Great Lakes counters that the MBE unequivocally excludes coverage for a specific type of damage to the TBM—machinery breakdowns resulting from any internal cause—so an explicit design defect exclusion in Section

---

[6] *TMW*, 619 F.3d at 577.

*Seattle Tunnel Partners, et ano. v. Great Lakes Reinsurance (UK) PLC, et al.*, No. 100168-1

2 would be redundant. Great Lakes also contends that it is not required to identify every internal cause of damage that may result in a machinery breakdown for the exclusion to apply. It argues that to conclude otherwise would render the MBE provision in this Policy wholly ineffective because it does not list any specific internal causes, and when interpreting an insurance provision, we avoid giving it a strained construction that renders the policy ineffective. We are persuaded by Great Lakes' arguments and agree with its reasoning.

STP also highlights that Section 1 of the Policy contains an explicit design defects exclusion, which is significant because "differences in policy wording indicate differences in intended meaning." STP's Suppl. Br. at 10 (citing *Dickson v. U.S. Fid. & Guar. Co.*, 77 Wn.2d 785, 789, 466 P.2d 515 (1970) (noting that changing language in particular policy from language used in other exclusionary clauses "manifested an obvious intent" that the clause not be read the same as the other clauses)). Section 1 contains an exclusion for "[d]efects of material workmanship design plan," which provides that Great Lakes will not cover "costs rendered necessary by defects of material workmanship design plan or specification." CP at 172. Great Lakes points out that Section 1 and Section 2 of the Policy cover distinct types of property that require different types of exclusions. Section 1 covers the tunnel itself; the temporary and permanent structures; and the materials, supplies, equipment, and other goods used in the

19

*Seattle Tunnel Partners, et ano. v. Great Lakes Reinsurance (UK) PLC, et al.*, No. 100168-1

execution of the construction project (excluding the TBM). Section 2 covers the tunnel boring machine. Great Lakes notes that in context, the defects exclusion is necessary for the construction-related portion of the project and an MBE would not be applicable. Further, an explicit design defects exclusion in Section 2 was unnecessary because the language of the MBE excludes coverage for machinery breakdowns resulting from an internal cause, which would include the machine's defective design.

We agree with the reasoning of the Court of Appeals and hold that the MBE as written excludes coverage for machinery breakdowns resulting from an internal cause, which includes a defective design.

Finally, STP argues the Court of Appeals erred by not finding coverage applying the efficient proximate cause rule. Under Washington law, the rule of efficient proximate cause provides coverage "'where a covered peril sets in motion a causal chain[,] the last link of which is an uncovered peril.'" *Zhaoyun Xia v. ProBuilders Specialty Ins. Co.*, 188 Wn.2d 171, 182-83, 400 P.3d 1234 (2017) (alteration in original) (quoting *Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co.*, 124 Wn.2d 618, 625, 881 P.2d 201 (1994)). "'"If the initial event . . . is a covered peril, then there is coverage under the policy regardless [of] whether subsequent events within the chain, which may be causes-in-fact of the loss, are excluded by the policy."'" *Xia*, 188 Wn.2d at 183 (quoting *Key Tronic*

20

*Corp.*, 124 Wn.2d at 625-26 (quoting *Safeco Ins. Co. of Am. v. Hirschmann*, 112 Wn.2d 621, 628, 773 P.2d 413 (1989))). This would first require a finding that the Policy covers damage for design defects and that those design defects caused the damage to the TBM. Under those circumstances, the efficient proximate cause rule might provide coverage for the last link in the causal chain, even if it is an excluded peril (i.e., the machinery breakdown). However, this doctrine does not apply where the initial event is an uncovered peril. We agree with the Court of Appeals that the efficient proximate cause doctrine does not apply because the initial event—the design defect—is an uncovered peril under the MBE.

III. Project Delay Losses

STP separately challenges the Court of Appeals ruling that the Policy does not cover losses "due to project delays." CP at 8911. The Court of Appeals concluded the language of the Policy's insuring clause limits coverage to direct *physical* losses and therefore does not provide coverage for nonphysical losses, such as delay costs.

STP first argues that the Policy must provide coverage for project delays because it does not specifically exclude such coverage. This argument assumes the Policy covers delay losses in the first instance. Before discussing any potential exclusion, the insured needs to show that the loss falls within the scope of the Policy's coverage.

21

The Policy's insuring clause provides that "[t]he Insurers will indemnify the Insured in respect of direct physical loss, damage or destruction . . . not specifically excluded herein . . . to the Interest Insured." CP at 135. Here, the Interest Insured is the TBM. It is undisputed that the TBM suffered direct physical loss. Petitioners state that "but for" the direct physical damage to the TBM, "none of the losses at issue would have been incurred." STP's Suppl. Br. at 24. Therefore, under STP's view, the Policy must cover all of the claimed losses, including losses due to project delays, because they incurred those losses only as a result of the physical loss. We disagree.

We rejected a similar argument in *Vision One*. In *Vision One*, the all-risk insurance policy "covered 'direct physical "loss" to Covered Property' caused by a covered peril." 174 Wn.2d at 522. The Policy at issue here covers "'direct physical loss, damage, or destruction'" to the insured property caused by a covered peril. CP at 8911. Under both all-risk policies, coverage is triggered when the insured property suffers a direct physical loss caused by any peril not specifically excluded. Here, coverage was triggered when the TBM suffered direct physical loss. Similarly, in *Vision One*, coverage was triggered when a newly poured concrete floor crashed down onto the lower level, resulting in "direct physical loss" to the insured property. Similar to STP's claim here, the insured in *Vision One* sought coverage for costs associated with the cleanup, repair, and reconstruction of

the collapsed concrete floor, including delay losses suffered as a direct result of the collapse. In considering whether the policy covered these delay losses, we explained that the policy's general grant of coverage "extended only to 'physical' losses to covered 'property.'" *Vision One*, 174 Wn.2d at 523. We highlighted that the delay-related financial losses at issue were neither physical losses nor losses to covered property. Just like here, in *Vision One* it was true that "but for" the direct physical damage to the building, the delay losses would not have been incurred. Nevertheless, we rejected the insured's argument and concluded the policy did not provide coverage for the delay-related financial losses. *Vision One*, 174 Wn.2d at 522-23. Applying that same analysis to the policy here, we hold that the Policy's insuring clause does not provide coverage for all types of losses, even where those losses are a consequence of the loss that triggered coverage, i.e., the physical loss to the covered property. We reject STP's argument that the Policy must cover delay losses because those losses were incurred as a result of the physical loss.

The Court of Appeals noted that here, like in *Vision One*, the insuring clause provides coverage for direct physical loss, damage, or destruction. The court concluded the language of the Policy's insuring clause limits coverage to direct *physical* losses and therefore does not provide coverage for nonphysical losses, such as delay costs. Thus, the Policy plainly did not provide coverage for nonphysical losses such as delay costs. We agree.

23

STP next argues that the basis of indemnity provision provides coverage for delay losses. This provision determines what is recoverable after coverage under the Policy is triggered. It states:

> In the event of Damage to the Interest Insured, the amount payable by the Insurer shall be the *full cost* of reinstatement of such Interest Insured.
> For the purposes of calculating the *full cost* of reinstatement, the following provisions shall apply:
> A.  Where Damage to Interest Insured can be repaired the cost of reinstatement shall refer to the restoration of the damaged portion of the Interest Insured to a condition substantially the same as but not better or more extensive than its condition when new.
> B.  Where Interest Insured is:
>     i)   totally lost or destroyed or
>     ii)  damaged and the cost of repairs equal, or exceed the value of the damaged Interest Insured (whereby the Interest Insured shall be deemed to be totally lost or destroyed)
>     the cost of reinstatement shall refer to the replacement thereof by similar property in a condition equal to but not better or more extensive than its condition when new less the value of any salvage.
> C.  In all cases, the cost of reinstatement shall refer to the final cost to the Insured after completion of the repair, reinstatement or replacement work (including a reasonable margin for profit where such work is carried out in whole or in part by the Insured).

CP at 135 (emphasis added). STP contends that costs associated with delay constitute a "cost of reinstatement" under paragraph C of the basis of indemnity provision. According to STP, the basis of indemnity unambiguously and "plainly states that what is recoverable is the 'full' and 'final' cost to repair and reinstate the TBM plus a reasonable margin for profit." STP's Suppl. Br. at 24. STP argues that

24

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

by rejecting coverage for delay losses, the Court of Appeals rendered the language "full cost" and "final cost" meaningless and ineffective, and contends that these terms—"full" and "final"—must include all costs "incurred in connection with repairing, reinstating, and replacing parts of the TBM to complete the Project," including delay-related costs. STP's Suppl. Br. at 21.

The Court of Appeals rejected STP's argument, reasoning that STP's claim that the basis of indemnity somehow creates and broadens the coverage to nonphysical loss failed given the Policy's express limit of coverage to direct physical loss. *STP*, 18 Wn. App. 2d at 627. We agree.

This reasoning is supported by our rules of insurance contract interpretation. When interpreting an insurance contract, we consider the policy as a whole, according to the entirety of its terms and conditions. We will harmonize any potentially conflicting clauses to give effect to all of the contract's provisions. And we give the language "'a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.'" *Queen Anne Park*, 183 Wn.2d at 489 (internal quotation marks omitted) (quoting *Queen City Farms*, 126 Wn.2d at 65)).

As stated previously, paragraph A of the basis of indemnity provision states, "Where Damage to Interest Insured can be repaired[,] the cost of reinstatement shall refer to the *restoration* of the *damaged portion* of the Interest Insured." CP at

*Seattle Tunnel Partners, et ano. v. Great Lakes Reinsurance (UK) PLC, et al.*, No. 100168-1

135 (emphasis added). When the insured interest must be replaced, "the cost of reinstatement shall refer to the *replacement thereof by similar property*." CP at 135 (emphasis added). And "[i]n all cases" of physical loss, damage, or destruction, "the cost of reinstatement shall refer to the final cost to the Insured after completion of the repair, reinstatement or replacement *work* (including a reasonable margin for profit *where such work is carried out in whole or in part by the Insured*)." CP at 135 (emphasis added). Read in the context of the complete provision, the "final" and "full" costs refer to the cost to complete the actual work to repair, reinstate, or replace the TBM. It does not extend coverage to costs associated with delay or with "extending the project," such as the cost to extend leases or easements.[7]

Supporting this interpretation, the Policy also lists certain enumerated "Extensions and Conditions" of coverage. CP at 111. These coverage extensions provide additional coverage for specific costs related to the repair, reinstatement, or replacement of the insured property following covered damage. For instance, the Policy provides a coverage "extension" for "professional fees," including fees for architects, surveyors, and consulting engineers, incurred in the reinstatement of the

---

[7] According to STP and WSDOT, their project delay losses include administrative overhead costs; transportation impacts; extended leases and easements; staff and expert costs; equipment rental; and "other costs associated with extending the project to repair, reinstate, and replace certain parts of the TBM." STP's Suppl. Br. at 2-3 (citing CP at 7891); STP and WSDOT's Joint Opp'n to Resp'ts' Mot. to Strike Portion of Pet'r's Suppl. Br. at 4-5 (citing CP at 4720).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

TBM. CP at 111, 116. The Policy also provides a coverage "extension" for costs incurred in the removal and disposal of the debris of the insured property, detritus, or materials brought onto the site as a consequence of covered damage. CP at 112, 116. As to the TBM specifically, the Policy provides a coverage "extension" for the cost of "dismantling and re-erecti[ng]" the TBM for the purpose of effectuating the necessary repairs. CP at 116-17.

Under STP's reading of the basis of indemnity clause, the clause would expand coverage to "all final costs," including the costs associated with project delays and the various extended coverage provisions would become superfluous. Consistent with *Vision One* and our insurance contract interpretation framework, we hold that the language of the insuring clause and basis of indemnity clause does not establish coverage for delay losses.

IV.    Loss of Use or Functionality

WSDOT challenges the Court of Appeals' determination that it cannot recover under Section 1 for loss of use of the tunneling works while repairing the TBM. The Court of Appeals affirmed the trial court's partial summary judgment on this issue, ruling that the tunneling works did not sustain the requisite direct physical loss or damage that would trigger coverage under Section 1. Great Lakes responds that the Policy language, "direct physical loss, damage or destruction," requires a showing of physical alteration to the insured property. Resp'ts' Suppl.

27

Br. at 22. WSDOT does not allege the tunneling works itself was physically damaged or altered. Rather, WSDOT alleges the tunneling works suffered direct physical loss or damage because the tunnel was "physically incapable of performing its essential function": completing construction of the tunnel. WSDOT's Suppl. Br. at 23. Therefore, according to WSDOT, it is entitled to recover costs associated with its loss of use of the tunneling works, i.e., costs associated with WSDOT's inability to use the tunneling works to continue construction. For reasons explained below, we agree physical loss or damage may under certain circumstances include the physical loss of use of insured property. However, this case does not present those circumstances.

The relevant provision in the Policy at issue is found in its insuring clause: "The Insurers will indemnify the Insured in respect of direct physical loss, damage or destruction . . . to the Interest Insured . . . ." CP at 164. The pertinent terms are not defined in the Policy, so they are assigned their "'plain, ordinary and popular meaning.'" *Queen Anne Park*, 183 Wn.2d at 491 (quoting *Queen City Farms*, 126 Wn.2d at 77).

"Loss" has many definitions, but is most pertinently defined as "the act or fact of losing[;] failure to keep possession[;] deprivation" and "the harm or privation resulting from losing or being separated from something." WEBSTER'S, *supra*, at 1338. It is also defined as "the state or fact of being destroyed or placed

28

*Seattle Tunnel Partners, et ano. v. Great Lakes Reinsurance (UK) PLC, et al.*, No. 100168-1

beyond recovery." WEBSTER'S, *supra*, at 1338. "Damage" is a "loss due to injury . . . or harm to person, property, or reputation." WEBSTER'S, *supra*, at 571. "Damage" also "suggests injury that lowers value or *impairs usefulness*." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/damage (last visited Sept. 12, 2022) (emphasis added). "Physical" is defined as "of or relating to natural or material things as opposed to things mental, moral, spiritual, or imaginary." WEBSTER'S, *supra*, at 1706. Further, "physical" means "having material existence[;] perceptible especially through the senses and subject to the laws of nature." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/physical (last visited Sept. 12, 2022). Similarly, "physical" "applies to what is perceived directly by the senses and may contrast with mental, spiritual, or imaginary." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/physical (last visited Sept. 12, 2022) (emphasis omitted). Within the context of the definition of "physical," "material implies formation out of tangible matter." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/physical (last visited Sept. 12, 2022). Finally, "direct" means "from the source or original without interruption or diversion" or "without any intervening agency or step." WEBSTER'S, *supra*, at 640.

Applying these definitions, we conclude that "direct physical loss [or] . . . damage" refers to the deprivation or dispossession of or injury to the insured property. The deprivation, dispossession, or injury must be physical. This means the loss must have a material existence, be tangible, or be perceptible by the senses.

WSDOT does not allege the tunneling works itself suffered any loss or damage that is physical, i.e., perceptible, material, or tangible. Instead, WSDOT argues it was deprived of *its use* of the tunneling works due to the physical blockage of the TBM. According to WSDOT, it must follow that this deprivation of its loss of use of the tunnel constitutes direct physical loss or damage.

As seen above, the definition of "loss" includes "deprivation." To "deprive" is "to take away[;] remove, destroy," "to take something away from," or "to keep from the possession, enjoyment, or *use* of something." WEBSTER'S, *supra*, at 606 (emphasis added). And "damage" suggests an injury "that *impairs usefulness*." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/damage (last visited Sept. 12, 2022) (emphasis added). Under these definitions, "loss" or "damage" may refer to the loss of use or functionality of a property. But even if we agree with this interpretation, the Policy language specifically provides coverage for *physical* loss or damage. The Court of Appeals, in its decision, highlighted the Policy language and concluded that "if a

30

*Seattle Tunnel Partners, et ano. v. Great Lakes Reinsurance (UK) PLC, et al.*, No. 100168-1

policy provides coverage for 'physical' loss, it does not provide coverage for loss of use unless that loss of use arises out of or as a result of the physical loss." *STP*, 18 Wn. App. 2d at 621. Thus, for coverage under the Policy, the loss of use of the insured property must be caused by some physical condition impacting the insured property. This conclusion is consistent with reasoning in other cases.

The Court of Appeals below cited two Washington Court of Appeals cases that considered loss of use claims: *Prudential Property & Casualty Insurance Co. v. Lawrence*, 45 Wn. App. 111, 724 P.2d 418 (1986), and *Guelich v. American Protection Insurance Co.*, 54 Wn. App. 117, 772 P.2d 536 (1989). In *Prudential*, the court determined that an insurance company was obligated to defend an insured party sued by a neighbor for a loss or obstruction of view. The insured homeowner had purchased two policies: a general homeowner's policy and a catastrophe policy. The homeowner's policy covered "'*physical* injury to or destruction of tangible property, including loss of use of this property.'" *Prudential*, 45 Wn. App. at 115 (emphasis omitted). The catastrophe policy covered "'damage to or destruction of tangible property,'" including "'loss of the use of the damaged or destroyed property.'" *Prudential*, 45 Wn. App. at 117. The court highlighted that the catastrophe policy did not limit coverage to "physical" injury or destruction, whereas the homeowner's policy did contain that limitation. The court reasoned that without the "physical" requirement, "damage" to property may "encompass

31

damage involving diminution in the value of property, even when no physical damage has otherwise occurred." *Prudential*, 45 Wn. App. at 117. The court further reasoned that the neighbors' "obstruction of view" may result in a diminution of property value and may *impair* the beneficial *use* and enjoyment of their tangible property, thereby falling within the policy's definition of "damage." *Prudential*, 45 Wn. App. at 118. The court held the insurance company could be liable for damages resulting from the obstruction of view under the language of the catastrophe policy, defining "damage" as an impairment in the use and enjoyment of the property. It did not hold that the homeowner policy's "physical injury" clause provided coverage, and it suggested that the homeowner's policy would not cover loss of use, i.e., obstruction of view, because it was expressly limited to *physical* injury. *Prudential*, 45 Wn. App. at 116-18.

*Guelich* similarly involved whether an insurance provider was obligated to defend an insured against a neighbor's loss-of-view claim. In that case, the Court of Appeals held that a policy covering "physical injury to tangible property" did not cover "[l]oss of use of a view." *Guelich*, 54 Wn. App. at 118, 121. Following the reasoning in *Prudential*, the court explained that losing the use of a view is not the type of loss that constitutes "physical injury to tangible property." *Guelich*, 54 Wn. App. at 120. The court, consistent with *Prudential*, found that the specific policy language "require[d] a claim to allege physical injury." *Guelich*, 54 Wn.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

App. at 119. It also noted the alleged injury was to intangible property—a view—and not to tangible property as the policy language required.

Additionally, the Court of Appeals in *Wolstein v. Yorkshire Insurance Co.*, 97 Wn. App. 201, 204, 985 P.2d 400 (1999), affirmed summary judgment in favor of the insurer where the policy covered "all risks of physical loss of or damage" to the insured property: a yacht. The court considered whether the policy allowed recovery for defective workmanship or faulty initial construction. The court determined that "the insured object must sustain actual damage or be physically lost" to trigger coverage under this policy. *Wolstein*, 97 Wn. App. at 212. In *Wolstein* the court recognized that a "physical loss" could include the physical dispossession of property without any discernible physical damage to it. These cases support the Court of Appeals' conclusion that an insurance policy that limits coverage to physical loss or damage will cover loss of use only when that loss of use arises out of or as a result of the physical injury to the insured property.

Similarly, and consistent with the ordinary meaning of "physical loss or damage," out-of-state cases support the conclusion that these terms in insurance contracts can refer to the loss of use of the insured property. Specifically, these cases show how a loss of use claim is appropriate where the insured property is rendered unfit for its intended purpose or uninhabitable based on some change in the physical condition of the property. The reasoning of these cases showcases how

33

the loss of use must be caused by some physical condition of the insured property.
In *Western Fire Insurance Co. v. First Presbyterian Church*, 165 Colo. 34, 437
P.2d 52 (1968), the court found coverage for damages due to "direct physical loss"
of a church where the loss of use of the church was a direct result of an
accumulation of gasoline that pooled under the premises. The court reasoned that
the physical condition of the premises made it uninhabitable and thus equated to a
direct physical loss. In *Sentinel Management Co. v. New Hampshire Insurance
Co.*, 563 N.W.2d 296 (Minn. Ct. App. 1997), a federal court considered whether
asbestos contamination constituted "direct physical loss." It rejected the insurer's
argument that the insured property must suffer structural damage to constitute
direct physical loss under the policy. Instead, the court concluded the physical
condition of the property, i.e., hazardous contamination by asbestos, rendered the
property useless. In *General Mills*, a federal court held the insured could recover
for loss of cereal product as a result of a pesticide contamination of its oats,
rendering them unfit for human consumption. The court concluded the insured
property—the food product—suffered a direct physical loss because the
contamination "seriously impaired" the property's function and value. *Gen. Mills,
Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 152 (Minn. Ct. App. 2001). In
*Gregory Packaging, Inc. v. Travelers Property Casualty Co. of America*, No. 2:12-
CV-04418 (WHW) (CLW), 2014 WL 6675934 (D.N.J. Nov. 25, 2014), a court

found coverage for "direct physical loss" where an insured property—a packaging facility—suffered a release of ammonia that rendered the facility uninhabitable.

In sum, these cases reason that the alleged loss of use of the insured property must be a result of or caused by some physical condition that impacts the property. The reasoning and conclusions of these cases are persuasive and consistent with the ordinary meaning of "direct physical loss or damage." However, even if we adopt this interpretation of the provision, WSDOT fails.

Any alleged loss of use of the tunneling works must be a result of or caused by some physical condition that impacted the tunneling works. Here, WSDOT alleges the physical condition is the physical blockage of the TBM within the tunnel and the loss of use is the inability to continue construction. However, the physical condition—the blockage—did not cause the loss of use—the inability to continue construction. As WSDOT explains, the TBM and tunneling works "inseparably functioned together to construct the tunnel." WSDOT's Suppl. Br. at 8. Therefore, the "tunneling works [was] unusable for [its] intended purpose of completing construction of the tunnel" because the TBM, which was necessary to continue construction, was inoperable and undergoing repairs. WSDOT's Suppl. Br. at 8. Accordingly, even if we interpreted "direct physical loss or damage" to include loss

35

*Seattle Tunnel Partners, et ano. v. Great Lakes Reinsurance (UK) PLC, et al.*, No. 100168-1

of use, no coverage under Section 1 is triggered because the alleged loss of use was not caused by a physical condition impacting the insured property.[8]

We affirm the Court of Appeals and remand to the trial court.

_____
Johnson, J.

WE CONCUR:

_____
González, C.J.

_____
Gordon McCloud, J.

_____
Madsen, J.

_____
Yu, J.

_____
Owens, J.

_____
Whitener, J.

_____
Stephens, J.

_____
Okrent, J.P.T.

---

[8] WSDOT also alleges it incurred costs in connection with construction of the access shaft to repair the TBM. WSDOT's Suppl. Br. at 29. However, as the Court of Appeals noted, WSDOT does not show how costs associated with construction of the access shaft to repair the TBM are recoverable under Section 1. Instead, these costs are related to repairing the TBM, which is insured under Section 2.